**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 24 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

DARHEE GRAY MCKISSICK,

       Defendant-Appellant.

--------------------

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

DELMAR ANTON ZEIGLER, a/k/a
Stix Zeigler,

       Defendant-Appellant.

No. 98-6320

No. 98-6351

**Appeals from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CR-98-29-L)**

Daniel G. Webber, Jr. (Patrick M. Ryan, United States Attorney, with him on the brief), Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee in No. 98-6320 and No. 98-6351.

Teresa Brown, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant in No. 98-6320.

Joseph L. Wells, Oklahoma City, Oklahoma, for Defendant-Appellant in No. 98-6351.

———————————

Before **BRORBY**, **ANDERSON**, and **BRISCOE,** Circuit Judges.

———————————

**BRORBY**, Circuit Judge.

———————————

Mr. Darhee Gray McKissick and Mr. Delmar Anton Zeigler were arrested following a shooting at a nightclub in Oklahoma City. The Oklahoma County District Attorney's office declined to file charges against Mr. McKissick for shooting with intent to kill but authorized charges against Mr. McKissick and Mr. Zeigler for trafficking in 20.9 grams of cocaine base. The State of Oklahoma subsequently dismissed these charges. However, a federal grand jury, sitting in the Western District of Oklahoma, returned a six-count indictment, charging Mr. McKissick in three counts and Mr. Zeigler in four counts. Count One charged Mr. McKissick with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Count Two charged Mr. Zeigler with being a felon in possession of a firearm in violation of U.S.C. 18 § 922(g)(1). Count Three charged both defendants with possession of sixty-three grams of crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Count Four

-2-

charged Mr. Zeigler with possession of sixteen grams of crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Count Five charged Mr. McKissick with carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Count Six charged Mr. Zeigler with carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Prior to trial, Mr. Zeigler moved to suppress the evidence against him. After holding a hearing on the motion, the district court denied Mr. Zeigler's request and the case proceeded to trial. The government filed an information pursuant to 21 U.S.C. § 851 notifying Mr. Zeigler it intended to seek enhanced penalties if Mr. Zeigler was convicted of the drug trafficking charges in Counts Three and Four. The Defendants were tried jointly. At the close of the government's case, the district court granted Mr. Zeigler's motion for acquittal on the weapons charges, Counts Two and Six. The court overruled Mr. Zeigler's motion for acquittal on the other counts and overruled Mr. McKissick's motion for acquittal.

The jury found Mr. Zeigler guilty on both drug trafficking charges. Pursuant to the statutory enhancements filed by the government, Mr. Zeigler was

sentenced to life without parole for each Count with the sentences to run concurrently, plus ten years of supervised release. The jury found Mr. McKissick guilty on all three counts with which he was charged. Mr. McKissick was sentenced to 120 months imprisonment on Count One and 240 months imprisonment on Count Three, those sentences to run concurrently. Mr. McKissick was also sentenced to five years imprisonment on Count Five, to be served consecutively to the other sentences. Both defendants filed timely appeals. These appeals are addressed simultaneously in this opinion. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and affirm.

I. BACKGROUND

In the early morning hours of December 7, 1997, a shooting took place in the parking lot of Lan's Night Club in Oklahoma City. The Oklahoma City Police Department sent out a dispatch reporting a drive-by shooting in the nightclub parking lot. According to the dispatch, the suspect vehicle was a 1970s model green Chevrolet Impala and the suspects were reported to be black males. Officer Dale Thomas, of the University Hospital Police, heard the dispatch and within minutes saw a car matching the description a couple of miles from the nightclub. Officer Thomas turned on his lights and stopped the car, but when he approached the car, it sped away. Officer Thomas followed the car to Presbyterian Hospital.

The driver, Mr. McKissick, got out of the car and stated he had been shot. Officer Thomas asked Mr. McKissick to place his hands on the car, and the officer conducted a quick pat-down search for weapons. Officer Thomas then asked the front seat passenger, Mr. Zeigler, to step out of the car. Mr. Zeigler placed his hands on the car and Officer Thomas conducted a quick pat-down search of Mr. Zeigler for weapons. When Officer Thomas's partner arrived, Mr. Zeigler was handcuffed and placed in Officer Thomas's patrol car. Officer Thomas then took Mr. McKissick inside the hospital for treatment. Mr. McKissick later admitted the car was his.

While Mr. McKissick was in the emergency room reception area, Mr. Tommy Simpkins, who was also at the hospital for treatment of a gunshot wound, saw Mr. McKissick and immediately identified Mr. McKissick as the person who had shot him. At trial, Mr. Simpkins testified he had gone to Lan's Night Club that evening, but left after a fight broke out. Mr. Simpkins further testified he was in a van with some other men in the nightclub parking lot when they encountered Mr. McKissick and Mr. Zeigler in a green Chevrolet. Mr. McKissick and Mr. Simpkins traded insults related to their respective street gangs, and then Mr. McKissick leaned out the driver's side window of his car and fired a gun, striking Mr. Simpkins in the chest.

Oklahoma City Police Department Officer William Patten responded to a call from Presbyterian Hospital, and quickly learned a vehicle believed to be the one involved in the shooting was at the hospital. He was told one of the car's occupants had been shot and the other occupant, Mr. Zeigler, was being held by the hospital police. Officer Patten decided to transfer Mr. Zeigler to his police car, intending to arrest Mr. Zeigler for the drive-by shooting. Although he had been told Mr. Zeigler had already been "patted down" for weapons, Officer Patten decided to conduct his own pat-down search of Mr. Zeigler before placing him in his patrol car. Officer Patten discovered a bulge in Mr. Zeigler's crotch area inconsistent with his genitals. Officer Patten suspected the bulge was narcotics and pulled the lump out of Mr. Zeigler's pants. The bulge turned out to be the sixteen grams of crack cocaine that formed the basis for Count Four. Officer Patten then placed Mr. Zeigler in his patrol car. Officer Patten and his partner, Officer Harper, then entered the hospital to find the driver of the car, Mr. McKissick. After finding Mr. McKissick sitting in a chair in the hospital emergency room with a bullet wound in his right arm, Officer Patten told Officer Harper to handcuff Mr. McKissick and arrest him for discharging a firearm from a motor vehicle. Officer Patten then went back outside and looked in Mr. McKissick's car. While Officer Patten was standing outside the car, he saw a package on the back seat floorboard containing what he believed to be additional

cocaine. However, Officer Patten did not mention the package in his report.

Officer Patten then transported Mr. Zeigler to the county jail. On the way, Mr. Zeigler admitted he had been smoking cigarettes laced with PCP. As Mr. Zeigler was being booked, he asked Officer Patten what charges he was facing. Officer Patten related the charges, and Mr. Zeigler responded: "The crack is mine, but I didn't shoot anybody."

Officer Darrin Guthrie, a technical investigator for the Oklahoma City Police Department, had been called to the hospital earlier in the evening on an unrelated matter. Officer Guthrie heard Mr. Simpkins accuse Mr. McKissick of shooting him in the chest. He witnessed the ensuing altercation between Mr. Simpkins and Mr. McKissick and assisted in separating them. Officer Guthrie restrained Mr. Simpkins and made sure he received medical attention. Officer Guthrie then returned to his vehicle, retrieved his camera, and took pictures of the victims and Mr. McKissick's car. The car doors were open and the engine was running. From the outside of the car, Officer Guthrie photographed spent shell casings and what he believed to be narcotics in a transparent, brown-colored baggie on the back seat floorboard. The car was then sealed and impounded. Officer Guthrie did not mention seeing the bag of suspected narcotics in his

report.

Later that day, Officer Patten told Detective Riggs he had seen a large package in the back of the car he believed to be additional cocaine. Detective Riggs applied for a search warrant to search Mr. McKissick's car. In his affidavit, Detective Riggs stated he went to the Oklahoma City garage and saw the plastic baggie observed by Officer Patten and several spent shell casings in Mr. McKissick's car. In his affidavit, Detective Riggs did not mention the other officers' failure to include their observations of the baggie in their reports.

While executing the warrant, Officer Guthrie found two spent .380 caliber casings, one spent 9 mm casing, an empty 9 mm magazine in the glove box, and a package on the back floorboard. The package was discovered to contain sixty-three grams of crack cocaine, with which both Defendants were charged with possessing with intent to distribute in Count Three. Officers also searched the entire nightclub parking lot. One spent .380 caliber shell casing and two spent 9 mm casings were recovered in the parking lot about four feet from each other.

Gregory Karim, a ballistics expert from the Oklahoma City Police Department testified the 9 mm casings from the parking lot and the 9 mm casing

found in Mr. McKissick's car had been fired from the same weapon. The .380 casings found in the car and the one found in the parking lot had similar markings, and were consistent with being fired from the same weapon, but Mr. Karim could not positively identify them as being fired from the same weapon. Sergeant Gordon Robertson, another ballistics expert, concluded the bullet recovered from Mr. Simpkins' chest was too heavy to have been fired from a .380 pistol and was most likely fired from a 9 mm automatic, but conceded it could also have been fired from a .38 special revolver. Mr. Simpkins testified a security guard near him in the parking lot at the time of the shooting had a .38 revolver, but he did not see or hear the security guard fire this weapon. When Mr. Simpkins was shot, the security guard fell to the ground as well, landing about five feet from Mr. Simpkins.

The sweater Mr. McKissick wore on the night of the shooting was tested for gunpowder residue in order to determine whether his wound could have been the result of a point blank shooting by Mr. Zeigler while he was the sole passenger in the car. The tests were negative. Mr. McKissick's sweater was not tested for a type of residue that would have been present had Mr. McKissick fired a gun. Mr. Karim testified a shooter's clothes might contain "primer residue" but he did not have the equipment necessary to detect that type of residue.

II. ANALYSIS OF MR. McKISSICK'S ARGUMENTS ON APPEAL

Mr. McKissick asserts two errors by the trial court. First, Mr. McKissick contends the evidence was insufficient to support his convictions and the district court's denial of his motion for judgment of acquittal was error. Second, McKissick contends the district court improperly denied his pretrial motion based on outrageous governmental conduct and, due to the government's misconduct, it had no jurisdiction to hear the case.

A. Sufficiency of the Evidence to Support Mr. McKissick's Conviction and the District Court's Denial of his Motion for Acquittal

Sufficiency of the evidence to support a jury's verdict is a legal issue which is reviewed *de novo*. *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999). On appeal we "ask only whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotation marks and citation omitted). The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt. *See United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997). In conducting this review we "may neither weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997) (quotation marks and citations

omitted). It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented. *See United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir.1995), *cert. denied*, 516 U.S. 1081 (1996). When reviewing the denial of a motion for judgment of acquittal based on insufficient evidence, this court conducts the same analysis, reviewing the judgment of the district court *de novo*. *See United States v. Ailsworth*, 138 F.3d 843, 846 (10th Cir.), *cert. denied*, 119 S. Ct. 221 (1998); *Pappert*, 112 F.3d at 1077; *United States v. Hooks*, 780 F.2d 1526, 1531 n.1 (10th Cir.), *cert. denied*, 475 U.S. 1128 (1986).

1. Count One: Felon in Possession of a Firearm in Violation of 18 U.S.C. § 922(g)(1)

In order to sustain a conviction under 18 U.S.C. § 922(g)(1), the government must prove: "1) the defendant was convicted of a felony; 2) the defendant thereafter knowingly possessed a firearm; and 3) the possession was in or affecting interstate commerce." *United States v. Capps*, 77 F.3d 350, 352 (10th Cir.), *cert. denied*, 518 U.S. 1027 (1996). Mr. McKissick contends the government failed to prove the second element of the crime: knowing possession of a firearm.[1]

---

[1] Mr. McKissick stipulated to the first element at trial and does not contest the third element.

Mr. McKissick acknowledges Mr. Simpkins identified Mr. McKissick as the person who shot him. However, Mr. McKissick argues this evidence was insufficient to prove possession of the firearm because Mr. Simpkins' credibility was suspect to the point of making his testimony unreliable. He points out Mr. Simpkins was so intoxicated by PCP, marijuana, and alcohol the night of the shooting that the doctors in the emergency room refused to give Mr. Simpkins any pain reliever while removing the bullet from his chest for fear they would over-medicate him. Mr. McKissick also points out Mr. Simpkins was in a gang fight and was hit over the head prior to being shot. Mr. McKissick notes Mr. Simpkins testified he heard gunshots in front of him and behind him and saw a security guard with a .38 revolver. Mr. McKissick also contends the physical evidence contradicts Mr. Simpkins' testimony.

We conclude Mr. Simpkins' testimony was more than sufficient to support the jury's findings. Mr. Simpkins testified he heard Mr. McKissick yell "F, Hoover" and Mr. Simpkins replied, "F, Prince Hall," referring to their respective street gangs. Mr. Simpkins testified he saw Mr. McKissick with both hands on a gun, he saw Mr. McKissick point the gun at him, and saw Mr. McKissick fire the gun, hitting Mr. Simpkins in the chest. At the hospital, Mr. Simpkins immediately identified Mr. McKissick as the person who shot him. Although Mr.

Simpkins was under the influence of several substances at the time of the shooting, and taking medication for pain resulting from a later shooting at the time of the trial, the court determined his credibility was not so suspect as to render his testimony unreliable. The jury also evidently came to this conclusion. On appeal, we do not weigh evidence or make credibility determinations. *See Pappert*, 112 F.3d at 1077. However, in reviewing the transcript of the trial, we note Mr. Simpkins was an extremely candid witness who clearly testified about the events on the night of the shooting. We conclude Mr. McKissick's assertions of unreliability are without merit.

Furthermore, the physical evidence, or lack thereof, did not contradict Mr. Simpkins' testimony. Mr. McKissick's sweater was tested for gunpowder residue to determine whether he might have been shot at close range by Mr. Zeigler, the co-defendant. No such evidence was found. Mr. McKissick contends this contradicts Mr. Simpkins' testimony that Mr. McKissick shot Mr. Simpkins, and concludes the evidence was insufficient to support a finding that the shooting could have occurred as Mr. Simpkins claimed. However, Mr. McKissick's sweater was never examined to determine whether Mr. McKissick fired a gun. It was not tested for primer residue, which might be found on the clothes of a shooter, because the equipment necessary to detect such residue was not

available. The lack of physical evidence on the sweater does not negate Mr. Simpkins' testimony that Mr. McKissick shot Mr. Simpkins.

Moreover, the ballistics evidence supported Mr. Simpkins' testimony. Gregory Karim, a ballistics expert from the Oklahoma City Police Department testified the 9 mm casings found in the parking lot and the 9 mm casing from Mr. McKissick's car had been fired from the same weapon. Sergeant Gordon Robertson, a senior firearms expert with the Oklahoma City Police Department, testified the bullet retrieved from Mr. Simpkins was most likely shot from a 9 mm.

In viewing the evidence in the light most favorable to the government, we conclude it was substantial and sufficient to overcome a motion for acquittal and to allow a reasonable jury to determine beyond a reasonable doubt Mr. McKissick was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

### 2. Count 3: Possession of Cocaine Base with Intent to Distribute in Violation of 21 U.S.C. § 841(a)(1)

Mr. McKissick also contends the evidence was insufficient to support his conviction of possession with intent to distribute the sixity-three grams of cocaine base found on the back floorboard of his car.

To establish a violation of 21 U.S.C. § 841(a)(1), the Government must prove the defendant: (1) possessed the controlled substance; (2) knew he possessed the controlled substance; and (3) intended to distribute or dispense the controlled substance. *United States v. Dozal*, 173 F.3d 787, 797 (10th Cir. 1999). The possession of the controlled substance may be actual or constructive. "Constructive possession may be established by circumstantial evidence and may be joint among several individuals." *United States v. Carter*, 130 F.3d 1432, 1441 (10th Cir. 1997) (quotation marks and citation omitted), *cert. denied*, 523 U.S. 1144 (1998). "Possession is constructive, rather than actual, when the defendant knowingly has ownership, dominion or control over the narcotics and the premises where the narcotics are found." *Dozal*, 173 F.3d at 797 (quotation marks and citations omitted). *See also United States v. Ruiz-Castro*, 92 F.3d 1519, 1531 (10th Cir. 1996) (defining constructive possession of a narcotic as "an appreciable ability to guide the destiny of the drug") (quotation marks and citation omitted). In cases involving joint occupancy of a place where contraband is found, mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession. *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994). In such cases, the government is required to present "direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." *United States v. Valadez-Gallegos*, 162

F.3d 1256, 1262 (10th Cir. 1998). The government must present "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the ... contraband." *Id*. (quotation marks and citations omitted).

Because Mr. Zeigler was in the car with Mr. McKissick and the cocaine was attributed to both Mr. McKissick and to Mr. Zeigler, this was a case involving joint occupancy and nonexclusive possession. In this case, the evidence was sufficient to support an inference that Mr. McKissick had knowledge of and access to the drugs in the car. Mr. McKissick admitted he owned the car. Mr. McKissick was driving the car immediately prior to the discovery of the drugs in the back seat. Mr. Zeigler was found to have cocaine hidden in his pants. Officers testified the sixty-three grams of cocaine were found in plain view on the floorboard behind the driver's seat of the car. The observance of drugs in plain view is a compelling circumstance from which knowledge may be inferred. *See United States v. McCoy*, 781 F.2d 168, 170-71 (10th Cir. 1985) (where guns were in the defendant's residence in close proximity to his personal possessions, the inference of constructive possession was properly supported). The inference that Mr. McKissick knew the drugs were present in his vehicle and he had sufficient control over the car and access to the drugs was not speculative. The totality of the circumstances provide the necessary nexus between Mr. McKissick and the

cocaine found in the car to support his conviction.

    3.  Count 5:  Carrying a Firearm During and in Relation to a Drug
Trafficking Crime in Violation of 18 U.S.C. § 924(c)

Mr. McKissick also contends the evidence was insufficient to support his

conviction under 18 U.S.C. § 924(c).  At the time of the offense, 18 U.S.C. §

924(c) provided:

> Whoever, during and in relation to any crime of violence or drug
> trafficking crime ... uses or carries a firearm, shall, in addition to the
> punishment provided for such crime of violence or drug trafficking
> crime, be sentenced to imprisonment for five years.[2]

Mr. McKissick was charged with "knowingly carrying a firearm during and in

relation to a drug trafficking crime" in violation of 18 U.S.C.§ 924(c).  Thus, in

order to establish a violation of § 924(c), the Government had the burden to prove

the following elements of the offense:  (1) Mr. McKissick committed a drug

trafficking crime; (2) Mr. McKissick knowingly "carried" a firearm, and (3) Mr.

─────────────

    [2]  18 U.S.C. § 924(c) was amended in 1998 by the Criminal Use of Guns
Act, Pub. L. No. 105-386, § 1(a)(1), 112 Stat. 3469 (1998), effective November
13, 1998.  Section 924(c)(1) now applies to "any person who, during and in
relation to any crime of violence or drug trafficking crime ... uses or carries a
firearm, or who, in furtherance of any such crime, possesses a firearm."  18
U.S.C. § 924(c)(1)(A).  *See United States v. Shuler*, 181 F.3d 1188, 1189 n.2
(10th Cir. 1999).  We do not consider the effects, if any, of the new language of
§ 924(c) because it did not become law until after Mr. McKissick committed the
crimes with which he is charged.

McKissick carried the firearm "during and in relation to" the commission of that crime. *See Shuler*, 181 F.3d at 1189-90 (listing the elements necessary to prove a violation of § 924(c) when the underlying offense is a crime of violence); *United States v. Lampley*, 127 F.3d 1231, 1240 (10th Cir. 1997), *cert. denied*, 522 U.S. 1137 (1998).

Mr. McKissick contends the government failed to prove he was carrying the firearm "in relation to" the drug trafficking crime. Mr. McKissick argues the mere presence of the firearm during the altercation between Mr. McKissick and Mr. Simpkins in the parking lot at Lan's Night Club was insufficient to show the gun was used "in relation to" a drug trafficking offense. However, Mr. McKissick was charged with "carrying" a firearm in relation to a drug trafficking offense, not "using" the firearm in relation to a drug trafficking offense. Therefore, we are not concerned with the analysis of the "use" prong of the statute. Thus, the sole issue under § 924(c) is whether Mr. McKissick carried the gun "in relation to" the drug trafficking offense.

We conclude there was sufficient evidence to satisfy the "in relation to" requirement of § 924(c). In *Smith v. United States*, 508 U.S. 223, 237-38 (1993), the Supreme Court clarified the meaning of the "in relation to" language

-18-

contained in § 924(c)(1). The *Smith* Court held although the phrase "in relation to" is expansive, it requires at a minimum the firearm have "some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence."[3] *Id.* The *Smith* Court further explained the "in relation to" language precludes the possibility one could be punished under § 924(c) for possessing a firearm while committing a drug trafficking offense "even though the firearm's presence is coincidental or entirely unrelated to the crime. Instead, the gun at least must facilitate or have the potential of facilitating, the drug trafficking offense." *Id.* at 238 (internal brackets, quotation marks and citations omitted).

This court addressed the "in relation to" portion of § 924 in *United States v. Shuler*, where we stated:

---

[3] The *Smith* Court also construed the term "use" in § 924(c)(1). 508 U.S. at 228-37. Its construction of the term was clarified in *Bailey v. United States*, 516 U.S. 137, 145-150 (1995), where the Court held the word "use" as used in § 924(c) requires the government to prove the defendant actively employed the firearm in furtherance of the underlying crime. However, the *Bailey* Court noted this more restrictive reading of the term "use" did not restrict the more expansive "carry" prong of § 924(c)(1) which could be used to bring offenders within the scope of the statute who would not satisfy the requirements of the "use" prong. 508 U.S. at 150. Because Mr. McKissick was charged with carrying a firearm in relation to a drug offense and because the only issue under § 924(c) is whether his carrying of the fire arm was "in relation to" the drug trafficking offense, the "use" issue is not present here.

A firearm is carried "during and in relation to" the underlying crime, when the defendant avails himself of the weapon and ... the weapon plays an integral role in the underlying offense. The Government must establish a nexus between the carriage of the firearm and the underlying offense.... To prove this necessary relation, the Government's evidence must support a finding that the defendant intended the weapon to be available for use during the [underlying crime].

181 F.3d at 1190 (internal brackets, quotation marks and citation omitted).

In reviewing the sufficiency of the evidence, this court presumes a nexus between a firearm and a drug trafficking offense when an individual with ready access to a firearm commits such an offense. *United States v. Baker*, 30 F.3d 1278, 1280 (10th Cir.), *cert. denied*, 513 U.S. 906 (1994). "'To establish ... that the firearm was carried "during and in relation to" a drug trafficking crime, the evidence must support a finding that the firearm furthered the purpose or effect of the crime and that its presence or involvement was not the result of coincidence.'" *Shuler*, 181 F.3d at 1190 (quoting *United States v. McRae*, 156 F.3d 708, 712 (6th Cir. 1998)). "'[A] conviction will be sustained under [§ 924(c)(1)] if the possessor of a weapon intended to have it available for possible use during or immediately following the transaction, or it facilitated the transaction by lending courage to the possessor.'" *Shuler*, 181 F.3d at 1190 (quoting *United States v. Payero*, 888 F.2d 928, 929 (1st Cir. 1989)).

Here, there was evidence that Mr. McKissick had ready access to the firearm during his possession of the cocaine because the Government showed he shot Mr. Simpkins in the chest while Mr. McKissick was sitting in the car containing the cocaine. This court has previously recognized guns are "tools of the trade" in the distribution of illegal drugs. *See United States v. Nicholson*, 983 F.2d 983, 990 (10th Cir. 1993) ("Drug traffickers may carry weapons to protect their merchandise, their cash receipts, and to intimidate prospective purchasers."); *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991). Thus, it is highly unlikely the presence of the handgun in a car containing a large amount of crack cocaine was merely coincidental. The gun had the potential of facilitating the distribution of the crack cocaine. Furthermore, the fact Mr. McKissick chose to use the handgun to shoot Mr. Simpkins in the chest after exchanging gang related insults does not change our conclusion. Section 924(c) does not require the gun to be carried or used exclusively in connection with the drug trafficking crime; the section only requires it to be carried in connection with the drug trafficking crime. *See Nicholson*, 983 F.2d at 990 ("the fact that defendant carried the weapon for personal protection when engaged in lawful activities does not negate the effect of its presence during illegal narcotics transactions."). *See also Payero*, 888 F.2d at 929 ("The defendant's sole purpose in carrying the weapon need not have been facilitation of the drug trafficking crime."). Here, the

evidence supports the conclusion Mr. McKissick carried the gun in furtherance of the drug trafficking crime of possession with intent to distribute cocaine. *Cf.* *Muscarello v. United States*, 524 U.S. 125, 127-38 (1998) (holding defendants "carried" a firearm within the meaning of § 924(c) when the guns were placed in locked glove compartment and trunk of the defendants respective cars and transported "during and in relation to" drug trafficking offenses).

We conclude the evidence was sufficient to support Mr. McKissick's convictions.

B. Mr. McKissick's Pretrial Motion to Dismiss Based on Outrageous Government Conduct

Mr. McKissick also contends the district court erred in denying his motion to dismiss Counts 1, 3 and 5 of the indictment based upon lack of jurisdiction and outrageous governmental conduct. He claims the Oklahoma City Metro Violent Crimes Task Force, the Oklahoma City Police Department, and the Federal Task Force for Violent Crimes engaged in "forum shopping" and vindictive prosecution. He claims their actions amounted to outrageous government conduct, depriving him of his right to due process, and depriving the federal court of jurisdiction to proceed in the prosecution against him. He asks this court to exercise our inherent supervisory powers to remedy the abuse.

"Defendants have the burden of proving outrageous government conduct, ... and we review this issue *de novo*, with factual findings reviewable under the clearly erroneous standard." *United States v. Diaz*, 189 F.3d 1239, 1245 (10th Cir. 1999) (quotation marks and citations omitted). "The outrageous conduct defense ... is an extraordinary defense that will only be applied in the most egregious circumstances. In order to prevail, the defendant must show that the challenged conduct violated notions of fundamental fairness and is shocking to the universal sense of justice." *Id.* (quotation marks and citations omitted).

Mr. McKissick's claims of outrageous government conduct stem from the fact he was originally held for violations of Oklahoma law, but when the Oklahoma District Attorney's office declined to file charges against him for shooting with intent to kill, he was charged with possession of a firearm in violation of federal law. He claims the federal indictment was wrongfully obtained because "[t]he same evidence found to be without merit by the state, was used by the federal government to bring charges that Mr. McKissick possessed a firearm," and he was "held in custody on the same evidence, while law enforcement searched for a forum to bring the charges." Mr. McKissick also contends his rights were violated because he was held under Oklahoma law for possession of 20.9 grams of cocaine base with intent to distribute (the cocaine

found in Mr. Zeigler's pants), but was subsequently charged under federal law with possession with intent to distribute the sixty-three grams of cocaine base discovered on the floorboard of the car. Mr. McKissick asserts these actions amounted to "forum shopping," were outrageous, and violated his right to due process because he was held on the state charges while the prosecution searched for a forum in which to prosecute him. Mr. McKissick asserts the alleged deprivation of his right to due process deprived the federal court of jurisdiction.

We conclude this argument is without merit. The facts do not demonstrate abusive governmental conduct requiring the dismissal of Counts 1, 3 and 5 of the indictment. State and federal governments have a legitimate interest in the prosecution of a person for acts violative of the laws of both. *United States v. Gourley*, 835 F.2d 249, 250 (10th Cir. 1987), *cert. denied*, 486 U.S. 1010 (1988). It is not a violation of due process for the United States to present to a federal grand jury evidence a state prosecutor found insufficient to support state charges.[4]

---

[4] The district court noted the government disclosed:

[T]he Oklahoma County District Attorney's Office's decision not to prosecute the shooting with intent to kill charge was based on the inability of the police to locate and interview the shooting victims. However, according to the government, further investigation by the Federal Bureau of Investigation working with the Oklahoma City Police Department as a part of the Oklahoma City Metro Violent Crime Task Force has produced statements from the shooting victims

-24-

*See United States v. Turpin*, 920 F.2d 1377, 1388 (8th Cir. 1990), *cert. denied*, 499 U.S. 953 (1991). *C.f. United States v. Reyes*, 966 F.2d 508, 509 (9th Cir.) (a prosecutor's decision to pursue a federal crime in federal court rather than to prosecute the crime in state court does not violate due process), *cert. denied*, 506 U.S. 927 (1992). Nor does it amount to outrageous government conduct, forum shopping, or vindictive prosecution. *See United States v. DeMichael*, 692 F.2d 1059, 1061-62 (7th Cir. 1982) (vindictive prosecution not found where the defendant was prosecuted by the federal government after two state prosecutions were dismissed and a federal prosecution was disposed of by plea bargain), *cert. denied*, 461 U.S. 907 (1983). Mr. McKissick's detention prior to being charged under federal statutes was not the result of collusion between law enforcement officials. Although the Oklahoma County District Attorney's office declined to prosecute Mr. McKissick for shooting with intent to kill, it did authorize a charge of trafficking in cocaine against Mr. McKissick. The federal charges against Mr. McKissick included a charge of possession with intent to distribute cocaine. The actions of the law enforcement officials in holding Mr. McKissick on the state charges prior to the filing of federal charges cannot be characterized as "outrageous." Simply because the federal charges were based on the cocaine

---

which have been produced to both defendants in this case.

-25-

found on the floorboard and the state charges were based on the cocaine found in Mr. Zeigler's pants. Mr. McKissick has not shown his detention prior to the filing of the federal charges was the result of "forum shopping" or that the actions of the state and federal officials amounted to outrageous governmental conduct. Thus, his arguments concerning vindictive prosecution and the jurisdiction of the district court fail.

III.  ANALYSIS OF MR. ZEIGLER'S ARGUMENTS ON APPEAL

Mr. Zeigler makes the following arguments on appeal:  (1) the trial court erred in denying his motion to suppress; (2) the evidence was insufficient to support Mr. Zeigler's conviction; (3) the trial court erred in denying his motion for a mistrial; (4) the application of 21 U.S.C. § 841(b)(1)(A) and § 851(b) was unconstitutional as applied to his sentencing; and (5) the trial court erred in enhancing Mr. Zeigler's sentence two points for possessing a dangerous weapon during a drug trafficking offense.

A.  Mr. Zeigler's Motion to Suppress

Mr. Zeigler claims the district court erred in denying his motion to suppress the evidence recovered from his person and the vehicle, as well as statements he made after his arrest. After conducting a suppression hearing, the district court

determined the cocaine found on Mr. Zeigler's person was properly seized incident to his arrest, the cocaine in the vehicle was properly seized pursuant to a valid warrant, but could have also been seized in an inventory search, and Mr. Zeigler's post-arrest statements were not tainted by any Fourth Amendment violation.

We recently described our standard of review of a district court's denial of a motion to suppress evidence as follows:

> When reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in a light most favorable to the government. We accept the district court's factual findings unless those findings are clearly erroneous. The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court. Keeping in mind that the burden is on the defendant to prove that the challenged seizure was illegal under the Fourth Amendment, the ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable *de novo*.

*United States v. Long*, 176 F.3d 1304, 1307 (10th Cir.) (citations omitted), *cert. denied*, 120 S. Ct. 283 (1999).

### 1. Search of Mr. Zeigler's Person

Mr. Zeigler contends the search of his person by Officer Patten was an invasive search conducted with Mr. Zeigler's pants pulled down, in full view of

the public. Without addressing the district court's finding the search of Mr.

Zeigler's person was incident to his lawful, contemporaneous arrest, Mr. Zeigler

characterizes this search as a "pat down" search as defined by *Terry v. Ohio*, 392

U.S. 1 (1968), and argues his Fourth Amendment rights were violated because the

search went beyond the scope necessary to justify purpose for the intrusion; a

search for weapons. Thus, he asserts the cocaine discovered in his pants should

have been suppressed, and the statements he made after his arrest should have

been suppressed as "fruit of the poisonous tree."

> The Fourth Amendment normally requires that law enforcement officers obtain a warrant, based on probable cause, before conducting a search. There are limited exceptions to that rule, however, one of which is that officers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.

*United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) (citations

omitted). Such a search is not limited to a frisk for weapons, but may have as its

purpose a search for evidence of a crime. *See United States v. Simpson*, 453 F.2d

1028, 1030 (10th Cir.), *cert. denied*, 408 U.S. 925 (1972). "A warrantless search

preceding an arrest is a legitimate search incident to arrest as long as (1) a

legitimate basis for the arrest existed before the search, and (2) the arrest

followed shortly after the search." *Anchondo*, 156 F.3d at 1045 (quotation marks

and citations omitted). *See also United States v. Lugo*, 170 F.3d 996, 1003 (10th

Cir. 1999).

Mr. Zeigler does not argue Officer Patten lacked a legitimate basis to arrest him prior to the search, and does not dispute that he was formally arrested immediately after the search. Nevertheless, we note we are satisfied Officer Patten had probable cause to arrest Mr. Zeigler prior to the search of his person.[5] We also conclude Officer Patten was justified in conducting a full, warrantless search of Mr. Zeigler's person incident to his arrest, and the discovery of the cocaine on Mr. Zeigler's person was the result of a lawful search incident to arrest. Consequently, the statements Mr. Zeigler made after his arrest were not the result of an illegal search leading to his arrest and need not have been suppressed as the "fruit of the poisonous tree." We also conclude the district court did not commit clear error by determining the search was not an intrusive

---

[5] "Arrests must be based on probable cause. Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *Anchondo*, 156 F.3d at 1045. Officer Patten testified he had already decided to arrest Mr. Zeigler in connection with the shooting at Lan's Night Club prior to the search of Mr. Zeigler's person based on the description of the vehicle, the presence of empty shell casings in the car, Mr. McKissick's reported gunshot wound, and Mr. Zeigler's condition. These circumstances would lead a reasonable person to believe Mr. Zeigler had committed a crime.

-29-

"strip search."[6] Thus, we need not address Mr. Zeigler's further arguments concerning the application of *Terry v. Ohio* to this case.

### 2. Search of the Car

Mr. Zeigler also contends the court should have granted his motion to suppress the evidence found in the car because the affidavit supporting the search warrant contained material omissions of fact. Officer Patten and other officers failed to mention in their reports that they observed cocaine in the car in plain view. Detective Riggs did not inform the magistrate of their omissions in his application for the search warrant. Mr. Zeigler argues this amounted to a material omission of fact in the affidavit, rendering the resulting search warrant invalid.

---

[6] After listening to the testimony of the officers involved and Mr. Zeigler at the suppression hearing, the district court rejected Mr. Zeigler's contention that the search of his person was an "invasive body search," a "strip search," or a "body cavity search" and concluded Mr. Zeigler was properly searched incident to his lawful arrest. Although Mr. Zeigler testified to the contrary, Officer Patten testified he did not remove Mr. Zeigler's clothes during the search, but he might have unzipped Mr. Zeigler's pants after discovering a lump in Mr. Zeigler's crotch area that was inconsistent with his genitals. Officer Patten's testimony supports the district court's finding of fact. We will not second guess the trial judge's conclusion as to the credibility of witnesses and the weight to be given to the evidence in the absence of a showing that those findings are clearly erroneous. *See Long*, 176 F.3d at 1307; *United States v. Pappas*, 735 F.2d 1232, 1233 (10th Cir. 1984). Mr. Zeigler has not shown that the court's finding concerning the degree of intrusiveness of the search was clearly erroneous.

Under *Franks v. Delaware*, 438 U.S. 154 (1978), the district court is required to hold a hearing on the veracity of the affidavit supporting a warrant "if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks*, 438 U.S. at 155-56), *cert. denied*, 119 S. Ct. 151 (1998)). The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods. *Id*. If the district court determines the opponent of the search warrant has proven his or her case by a preponderance of evidence at the hearing, then the district court must suppress the evidence obtained pursuant to the warrant. *Id.*

Although it would have been better had Detective Riggs included the information concerning the police reports in the affidavit, we are not convinced it was the result of "reckless disregard for the truth" or a "deliberate falsehood." Furthermore, we conclude none of the omitted information would have altered the magistrate judge's decision in this case. Detective Riggs requested a warrant to search for evidence of a shooting as well as for cocaine in the car. Mr. Zeigler does not dispute the validity of the affidavit to support a search for evidence of

the shooting. Furthermore, Detective Riggs stated in the affidavit that he had personally observed the bag of cocaine in plain view in the car when he looked at the sealed car in the impoundment lot. We conclude the facts contained in the affidavit would have supported the issuance of a search warrant even if Officer Riggs had noted the other officers failed to mention the cocaine they observed in plain view in their reports. Thus, we affirm the district court's ruling, and need not address the district court's alternative basis for upholding the search.

B. The Sufficiency of the Evidence to Support Mr. Zeigler's Convictions

Mr. Zeigler contends the evidence was insufficient to support the jury's verdict on the third and fourth counts. Count Three charged both defendants with possession of sixty-three grams of crack cocaine with intent to distribute. Count Four charged Mr. Zeigler with possession of sixteen grams of crack cocaine with intent to distribute. Our review of the sufficiency of the evidence to support a jury verdict is as stated previously:

> [I]n reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de novo and ask only whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.

*United States v. Hanzlicek*, 187 F.3d at 1238 (quotation marks and citation omitted).

1.  Count 3:  Possession of the Sixty-Three Grams of Cocaine With
Intent to Distribute, in Violation of 21 U.S.C. § 841(a)(1)

Mr. Zeigler claims the evidence was insufficient to support his conviction

for possession with intent to distribute the sixty-three grams of cocaine found in

the back of the car.  He argues the government had no evidence to connect him to

the sixty-three grams of cocaine except for his presence in the car, and this  was

insufficient to convict him on Count 3.

As stated previously in our analysis of Mr. McKissick's appeal, this is a

case of constructive joint possession.  Thus, the government was required to show

some connection or nexus linking Mr. Zeigler to the sixty-three grams of cocaine

by presenting "evidence supporting at least a plausible inference that the

defendant had knowledge of and access to the ... contraband." *Valadez-Gallegos*,

162 F.3d at 1262 (quotation marks and citation omitted).  The following facts

support the inference that Mr. Zeigler was aware of the sixty-three grams of

cocaine and had access to it:  Mr. Zeigler was the only passenger riding in the car

with Mr. McKissick; cocaine was discovered on Mr. Zeigler's person; the sixty-

three grams of cocaine were discovered in plain view on the floorboard of the

car;[7] the evidence indicated sixty-three grams of cocaine is a commercial quantity

---

[7] The observation of drugs in plain view is a compelling circumstance from
which knowledge may properly be inferred.  *See McCoy*, 781 F.2d at 171 (the

-33-

of cocaine, supporting the inference that it was not for personal use. In viewing the evidence in the light most favorable to the Government, we have no trouble concluding the jury could have properly found Mr. Zeigler guilty beyond a reasonable doubt on Count 3.

2. Count 4: Possession With Intent to Distribute the Sixteen Grams of Cocaine Found on Mr. Zeigler's Person, in Violation of 21 U.S.C. § 841(a)(1)

Mr. Zeigler contends the evidence was insufficient to support his conviction on this count because there was "no credible evidence that the quantity of drugs possessed did not exceed an amount for personal consumption and therefore did not support an inference of intent to distribute." However, at trial, Officer Patten testified he had been involved in hundreds of narcotics arrests and a personal use quantity of crack cocaine was usually one "rock" weighing about 0.2 grams, costing about $20.00. Although Officer Tonya Estridge conceded that it was possible for sixteen grams to be for the personal use of a heavy user, she also testified she had never encountered such a heavy user in her eleven years of work on the police force. Officer Estridge further testified crack cocaine sold for personal use was usually sold in amounts valued between $10.00 and $40.00. In

---

inference of constructive possession was proper where guns were either in plain view in defendant's residence or in "places where they could hardly have escaped his knowledge.").

-34-

evaluating the evidence in the light most favorable to the Government, we conclude the jury could have reasonably determined Mr. Zeigler intended to distribute the sixteen grams of crack cocaine.

### C.  Refusal to Grant a Mistrial

Mr. Zeigler next contends the district court erred in denying his motion for a mistrial because he was prejudiced by the use of a stun belt restraint and due to the remarks of a potential juror during voir dire.  We review the court's denial of Mr. Zeigler's motion for a mistrial for an abuse of discretion.  *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1258 (10th Cir. 1999).

#### 1.  The Use of a Stun Belt

After the completion of jury selection, but before opening arguments, counsel for Mr. Zeigler approached the bench and informed the court he had just learned the defendants were wearing stun belts beneath their clothing.  The court confirmed it had approved such a precaution and noted the devises were not noticeable.  During a hearing in chambers the next morning, the court set forth its reasons for allowing the stun belts to be used.  Among these reasons, the court noted the United States Marshals suspected other gang members from Los Angeles might attempt to disrupt the proceedings.  The court also found the stun

-35-

belts were not visible under the defendants' clothing. Although Mr. Zeigler's counsel had not noticed the belts because he was sitting across the table from the defendants, he argued the jury might have been able to see them. However, there is no evidence in the record that any member of the jury noticed the stun belts. Thus, we do not presume prejudice to Mr. Zeigler and conclude the court did not abuse its discretion in denying Mr. Zeigler's motion for a mistrial. *See Yates v. United States*, 362 F.2d 578, 579 (10th Cir. 1966) (no prejudice to the defendant found where there was no evidence any juror in fact observed him wearing shackles in the courtroom).

### 2. The Remarks of a Potential Juror

Mr. Zeigler contends the trial court erred in denying his motion for a mistrial based on the alleged prejudice resulting from the remarks of a potential juror. In response to questioning by the court during voir dire, one potential juror indicated she had a preconceived idea of the defendants' guilt due to the "body language" the defendants were exhibiting. The potential juror also indicated she had experience with "them" due to her seven and a half years of employment as a nurse at the Oklahoma Department of Corrections.[8] The court dismissed the

---

[8] The following exchange took place between the court and the potential juror:

potential juror for cause, and both defendants' counsel moved for a mistrial, claiming all the potential jurors had been tainted by the remarks. The court denied the motion, but immediately cautioned the remainder of the jury pool to disregard the remarks, noting the dismissed vinireperson was "no expert that the Court is aware of in any kind of body language," Mr. McKissick and Mr. Zeigler did not appear to the court to be displaying any kind of body language or posture that would affect the jury's determination in any way.

"When improper or prejudicial remarks are made by one venireperson and

---

THE COURT: [Y]ou said you don't believe so. Let me ask you a question. All that the government or all that Mr. Zeigler or Mr. McKissick are asking of you is that you not have some preconceived idea that you couldn't put aside and listen and basically make a decision based on the evidence that is introduced here and the law as I instruct you, and that's all that any of the parties are asking is whether you can do that.

VENIREPERSON: I believe I could do that. My only hesitation was I deal with them every day. I have a preconceived [idea] because of their body language that they are presenting now. I have an idea how they are presenting without hearing any evidence of any kind.

THE COURT: Can you set that aside []?

VENIREPERSON: I believe I can. I believe I can.

THE COURT: ... [O]ut of an abundance of caution I don't want to put you in a difficult position or any of the parties I think I will excuse her for cause.

heard by other venirepersons during the jury selection process, we have held that the test of juror impartiality is whether the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *United States v. Lacey*, 86 F.3d 956, 969 (10th Cir.), *cert. denied*, 519 U.S. 944 (1996) (quotation marks and citation omitted). Although the excused juror demonstrated some amount of bias against the defendants, "the partiality of the petit jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused from service." *Id.* The district court apparently believed its cautionary instruction was sufficient to cure any possible prejudice against the defendant. The court also told the remaining jurors that, in its opinion, the defendants were not exhibiting any type of body language. "Because the district court is in the best position to judge the effect of improper statements on a jury and the sincerity of the jurors' pledge to abide by the court's instructions, its assessment is entitled to great weight." *Id.* (quotation marks and citations omitted). After reviewing the record, we do not believe the district court abused its discretion by denying Mr. Zeigler's request for a mistrial.

D. Enhancement of Mr. Zeigler's Sentence

Mr. Zeigler contends the district court violated his right to equal protection under the law when it used two Oklahoma drug convictions both as predicates for

the 21 U.S.C. § 841(b) enhancement and as convictions resulting in three criminal history points each under U.S.S.G. § 4A1.2(d).

We review Mr. Zeigler's equal protection claim regarding the sentencing guidelines under the rational basis standard to determine whether the challenged sentence is based on an arbitrary distinction or upon a rational sentencing scheme. *Chapman v. United States*, 500 U.S. 453, 465 (1991). "[S]tatutory classification will be set aside as violative of equal protection only if no grounds can be conceived to justify them as rationally related to a legitimate state interest." *United States v. Lee*, 957 F.2d 778, 782 (10th Cir.), *cert. denied*, 506 U.S. 978 (1992).

In drug trafficking cases involving fifty grams or more of cocaine base, 21 U.S.C. § 841(b)(1)(A) calls for a mandatory life sentence if the defendant committed the instant offense "after two or more prior convictions for a felony drug offense have become final." 21 U.S.C. § 841(b)(1)(A). 21 U.S.C. § 802(13) defines the term "felony" for purposes of the § 841 enhancement as "any Federal or State offense classified by applicable Federal or State law as a felony." U.S.S.G. § 4A1.1(a) requires the addition of three points for each prior sentence of imprisonment exceeding thirteen months. The total number of points is used to

determine the criminal history category.  U.S.S.G. § 4A1.1.  While U.S.S.G.

§ 4A1.2(c)(2) provides "[j]uvenile status offenses" are never counted as a prior

sentence, U.S.S.G. § 4A1.1(d)(1) requires three points to be added under

§ 4A1.1(a) if the defendant committed the prior offense prior to the age of

eighteen and "the defendant was convicted as an adult and received a sentence of

imprisonment exceeding one year and one month."

In accordance with 21 U.S.C. § 851, the government filed an information

prior to trial giving Mr. Zeigler notice that his previous two drug related felonies

could result in life imprisonment if convicted on the instant drug charges.  In the

presentence report,  Mr. Zeigler's previous drug convictions were used in

determining his criminal history score of IV pursuant to U.S.S.G. § 4A1.1(a).

According to the presentence report,  the guideline range for imprisonment was

210-262 months based on Mr. Zeigler's total offense level of 34 and criminal

history score of IV, but because the two previous drug felonies could be used to

enhance his sentence to life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A),

the proper term was life imprisonment.[9]  After hearing argument at the sentencing

---

[9]  According to U.S.S.G. § 5G1.1(b), "[w]here a statutorily required
minimum sentence is greater than the maximum of the applicable guideline range,
the statutorily required minimum sentence shall be the guideline sentence."

hearing, the district court rejected Mr. Zeigler's constitutional argument and concluded it had no choice under the guidelines but to sentence him to life imprisonment pursuant to 21 U.S.C. § 841, and adopted the criminal history category and total offense level recommended in the presentence report.

Mr. Zeigler does not deny he was convicted of the prior Oklahoma offenses, but contends the use of these convictions as the predicates for the § 841(b) enhancement and as convictions resulting in the three criminal history points each under U.S.S.G. § 4A1.2(d) denied him equal protection under the law. Specifically, he argues he was treated differently than similarly situated persons because some states do not allow the unsealing of juvenile records, and the states differ on the ages and crimes for which persons under eighteen can be prosecuted as adults. He also argues U.S.S.G. § 4A1.2(d)(1) is void for vagueness.

We conclude that the use of Mr. Zeigler's Oklahoma felonies as predicate offenses for the § 841 enhancement did not deprive him of equal protection under the law. Congress intentionally left certain aspects of the § 841 enhancements to be triggered by the laws of the states. The language of 21 U.S.C. § 802(13) clearly ties the definition of the term "felony" for purposes of this enhancement to the state's classification of the crime as a felony. Mr. Zeigler was convicted as an

adult for the two Oklahoma felonies. Although States have different criteria for determining when a juvenile can be charged as an adult, this does not render the sentencing scheme irrational any more than does relying on the states' various definitions of felonies. "It is not irrational for Congress to defer to state law with regard to the characteristics of a prior offense, and doing so is no more intentionally arbitrary than our system of federalism itself." *United States v. Lender*, 985 F.2d 151, 156 n.* (4th Cir. 1993) (rejecting equal protection challenge to 18 U.S.C. § 924(e)(2)(B), Armed Career Criminal Act's definition of "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" and holding Congress intended to incorporate state law in determining whether offenses committed while the defendant was a juvenile are to be considered predicate offenses under the Act). *See also United States v. Mendiola*, 42 F.3d 259, 261-62 (5th Cir. 1994) (rejecting an equal protection and due process attack on U.S.S.G. § 2P.1(b)(3) where the defendant argued his rights were violated by the incorporation of state law in determining whether he was entitled to a reduction in his sentence under the guidelines); *United States v. Cure*, 996 F.2d 1136, 1139-41 (11th Cir. 1993) (rejecting the same argument put forth in *Lender*, and stating when Congress expressly indicates an intent to incorporate diverse state laws in defining a predicate offense, the Supreme Court's preference for uniformity is not controlling), *cert. denied,* 510 U.S. 1121

(1994); *United States v. Inglesi*, 988 F.2d 500, 502-03 (4th Cir. 1993) (rejecting the defendant's equal protection attack on U.S.S.G. § 4A1.2(d) where the defendant argued an unconstitutional disparity arose depending upon whether the defendant was convicted of the predicate offenses in a state that seals juvenile records). Moreover, Mr. Zeigler's assertion that similarly situated juveniles might be treated differently because some states allow the unsealing of juvenile records is inapplicable to this appeal because he was convicted as an adult.

Because we conclude the use of Mr. Zeigler's adult certified felonies as predicate offenses in sentencing him to life imprisonment under § 841(b) did not violate his right to equal protection, we need not address Mr. Zeigler's further arguments concerning the use of his prior felony offenses for the enhancement of his guideline sentence pursuant to U.S.S.G. § 4A1.1(a). Because Mr. Zeigler's prior felonies were properly taken into consideration by the district court in imposing the mandatory life sentence pursuant to 21 U.S.C. § 841(b)(1)(A), the statutory mandatory sentence was greater than the maximum potential under the guidelines regardless of whether the calculation of the guidelines sentence includes the increase under U.S.S.G. §4A1.1(a). In such a situation, the statutory mandatory minimum sentence becomes the guidelines sentence. U.S.S.G. § 5G1.1(b). Thus, Mr. Zeigler's arguments concerning the application of

U.S.S.G. § 4A1.1(a), and the alleged vagueness of U.S.S.G. § 4A1.2(d)(1) are moot. *See United States v. Gray*, 152 F.3d 816, 822 (8th Cir. 1998) (declining to address the defendant's arguments concerning the district courts rulings under the Sentencing Guidelines because the district court did not err by sentencing the defendant under 21 U.S.C. § 841(b)(1)(A)), *cert. denied*, 119 S. Ct. 1091 (1999); *United States v. Sepulveda*, 15 F.3d 1161, 1202 (1st Cir. 1993) (defendant's argument under guidelines would have no effect on the sentence "due to the overriding force of the mandatory minimum prescribed by 21 U.S.C. § 841(b)(1)(B).").

E.  Enhancement Under U.S.S.G. § 2D1.1(b)(1)

As stated above, because the statutory mandatory minimum sentence imposed in this case was life imprisonment, the issue of whether the district court properly increased Mr. Zeigler's sentencing guidelines range by two levels for possession of a firearm during a drug trafficking offense pursuant to U.S.S.G. § 2D1.1 (b)(1) is moot.

The judgment of the district court in cases No. 98-6320 and 98-6351 is **AFFIRMED**.

-44-