FILED
United States Court of Appeals
Tenth Circuit

May 10, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JERMALL CAMPBELL, a/k/a "L,"

     Defendant-Appellant.

No. 09-3212

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:07-CR-10142-JTM-1)**

---

Paul S. McCausland, Young, Bogle, McCausland, Wells & Blanchard, P.A., Wichita, Kansas for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (and Lanny D. Welch, United States Attorney, with him on the brief), Topeka, Kansas for Plaintiff-Appellee.

---

Before **HARTZ**, **BALDOCK,** and **GORSUCH**, Circuit Judges.

---

**BALDOCK,** Circuit Judge.

---

A jury convicted Defendant Jermall Campbell of possessing ammunition as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Law enforcement seized the ammunition during a warrant search of Defendant's Wichita, Kansas home.

Defendant challenged the search with a motion to suppress and a request for a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). After conducting an evidentiary hearing, the district court denied Defendant's motion to suppress, concluding (1) probable cause existed to support the warrant, (2) the officers involved in the preparation of the affidavit supporting the warrant did not deliberately mislead or act with reckless indifference to the truth, and, otherwise, (3) law enforcement relied in objective good faith upon the warrant.[1] Defendant appeals.

---

[1] Defendant also moved to dismiss the Section 922(g)(1) charge on the grounds that the statute exceeded Congress's Commerce Clause authority because the intrastate possession of ammunition does not impact interstate commerce and cannot support criminalizing simple possession. The district court summarily dismissed this argument. While we review "challenges to the constitutionality of a statute de novo," we also are bound by the holdings of previous panels unless and until they overruled by a rehearing of this Court en banc or the Supreme Court. <u>Yes On Term Limits, Inc. v. Savage</u>, 550 F.3d 1023, 1027 (10th Cir. 2008); <u>see</u> <u>also</u> <u>In re Smith</u>, 10 F.3d 723, 724 (10th Cir. 1993). In <u>United States v. Patton</u>, 451 F.3d 615, 620, 623, 636 (10th Cir. 2006), we acknowledged the apparent alteration in the Supreme Court's Commerce Clause jurisprudence in light of <u>Gonzales v. Raich</u>, 545 U.S. 1 (2005), <u>United States v. Morrison</u>, 529 U.S. 598 (2000), and <u>United States v. Lopez</u>, 514 U.S. 549 (1995). Nonetheless, we followed the older Supreme Court precedent directly on point, <u>Scarborough v. United States</u>, 431 U.S. 563 (1977), "which held that Congress intended a felon-in-possession statute to prohibit possession of any firearm that moved in interstate commerce" and "assumed that Congress could constitutionally regulate the possession of firearms solely because they had previously moved across state lines." <u>Patton</u>, 451 F.3d at 634. Thus, we concluded Congress does have the authority under the Commerce Clause to prohibit felons' intrastate possession of bulletproof vests that had once traveled in interstate commerce. <u>Id.</u> at 620, 636; <u>see</u> <u>also</u> <u>United States v. McCane</u>, 573 F.3d 1037, 1047 (10th Cir. 2009) (rejecting the argument that Section 922(g) surpasses Congress's authority under the Commerce Clause); <u>United States v. Urbano</u>, 563 F.3d 1150, 1154 (10th Cir. 2009) (same). Because we are bound by <u>Scarborough</u> and <u>Patton</u>'s holdings, we reject Defendant's Commerce Clause challenge to Section 922(g)(1)'s

(continued...)

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district's denial of Defendant's motion to suppress.

I.

The crux of this case is the affidavit supporting the warrant which authorized the search of Defendant's home in May 2007. Ron Goodwyn serves as a narcotics detective with the Sedwick County Sheriff's Office and as a Task Force Officer assigned to work with the Drug Enforcement Administration and the Gang Task Force, which was composed of federal, state and local law enforcement officers. As part of his work as Task Force Officer, he prepared the 120-page affidavit which describes the evidence of the Crip street gang and its subsets' activities in Wichita gathered by law enforcement over the last decade. Detective Goodwyn explained that as a result of his participation in this investigation, he learned that members of the Crips generally conduct their illegal activities with other known members of the Crips and individuals closely associated with the gang. He further explained that the Crips have a history of using violence to maintain control over the drug trade in Wichita. Based upon his experience and training, he also averred that like individuals engaged in legal business enterprises, Crip gang members maintain records such as address books, letters, outstanding accounts registers, profits

[1](...continued)
prohibition of felons' intrastate possession of ammunition that once traveled in interstate commerce.

3

generated and other indicia of their enterprise. Specifically, Detective Goodwyn identified as Crip gang members thirty-three individuals "through investigative methods such as reviewing of police reports, information gathered by the [WPD] gang officers, interviews of gang members and associates, surveillance, phone records, and undercover operations utilizing confidential informants." Detective Goodwyn asserted he had probable cause to believe these individuals were engaged in "on going and continued patterns of violations" of numerous laws, including but not limited to, conspiracy to distribute narcotics, continuing criminal enterprise, maintaining drug involved premises, felon in possession of a firearm, money laundering, and violent crimes in aid of racketeering. The affidavit identified fifteen different residences to be searched for evidence such as firearms, ammunition, telephone records, gang paraphernalia, and other indicia of gang activity.

In addition, Detective Goodwyn described the information law enforcement received from three cooperating witnesses known as CW #1, CW #2, and CW #3. All three witnesses are "documented" members of the Crips or one of its subsets operating in Wichita and claim to possess personal knowledge of the history and activity of these gangs. The affidavit then provided ninety-seven pages of specific examples of alleged Crip street gang association and criminal activity. As to Defendant in particular, the affidavit provided the following:

- Defendant lives at 2331 N. Green.
- Defendant is associated with the Neighborhood Crips street gang.
- On July [31], 1997, while executing a search warrant on 1320 N.

4

Indiana, which was the residence of Curtis Profit, an alleged Neighborhood Crips gang member, [D]efendant was inside the residence at the time.

• On October 4, 2000, [D]efendant was stopped in a vehicle at 19th and Green Streets and a plastic baggie containing a small amount of cocaine was located in the vehicle. Defendant was convicted of possession of paraphernalia in municipal court.

• On October 24, 2000, officers responded to a call of shots fired at 1247 N. Platt, the residence of James Jones. Officers found shell casings in the street and discovered that the Jones' residence had been shot at. Defendant was inside the residence. The victims were allegedly uncooperative with officers.

• On November 24, 2000, Tanisha Webb reported that several black males entered her house at 2504 E. 8th Street and began shooting. Three victims were hit by gunfire, two of whom were allegedly members of the Folk street gang. Marteaus Carter and James Jones were arrested and convicted of aggravated battery for the shooting, which was allegedly in retaliation for the shooting of Lucas Wade on November 23, 2000. While officers were searching for Marteaus Carter after the shooting, they stopped a vehicle associated with him, which was driven by [D]efendant.

• On March 2, 2001 [D]efendant was stopped in a vehicle at 17th and Minnesota Streets and arrested for a traffic warrant. Officers located a baggie of crack cocaine under the passenger seat where Derrick Waite, allegedly associated with the Neighborhood Crips, was seated.[2]

• On October 10, 2001, [D]efendant was gambling at 1906 E. 24th Street when he, Carlos Adair, allegedly a Neighborhood Crip, and Tyrone Adair were robbed at gunpoint of six hundred dollars. This residence was rented by Tommy Williamson, also allegedly a Neighborhood Crip, at the time. Williamson lived at another address, 1716 N. Bluff. At around 1900 to 1930 hours, someone shot at the house at 1906 E. 24th Street. At 2025 hours, the house was set on fire. At 2040 hours, someone shot at Tommie Williamson's other house at 1716 N. Bluff. At 2340 hours, Terry Carter a.k.a. Terry Gasper, a

---

[2] "The Goodwyn Affidavit states that this incident occurred in 1991, but this is an obvious typographical error when viewed in the time line the affidavit sets forth." United States v. Campbell, Memorandum and Order Denying Motion to Suppress and Dismiss, No. 07-CR-10104-MLB, 2007 WL 2155657, at *2 n.5 (D. Kan. July 25, 2007) (Doc. #27) (unpublished).

Blood, was shot while visiting his girlfriend at 1642 N. Estelle. A 9mm shell casing was recovered which matched the 9mm used at 1716 N. Bluff. At 2358 hours, Andre Walker, a Blood, was approached by defendant, Gregory Epps, Carlos Adair and Tyrone Adair. As Walker drove away, his vehicle was shot at several times and he was struck in the back. On October 11, 2001, [D]efendant was arrested at 1332 N. Spruce and a 12 gauge shotgun was found in the residence. He was charged with aggravated battery for the shooting of Andre Walker, arson for the fire at 1906 E. 24th Street, and possession of a firearm by a felon for the shotgun. He pled guilty to arson and criminal possession of a firearm.

• On June 19, 2003, officers stopped a vehicle driven by [D]efendant at 9th and Green Streets. Lonnie Wade, an alleged Neighborhood Crip, was in the vehicle.

• On July 2, 2006, David Barney was shot and killed while walking in the area of 100 N. Spruce. Confidential Witness # 3 ("CW # 3") stated that [D]efendant shot and killed David Barney and that CW # 3 was present when it occurred.

United States v. Campbell, Memorandum and Order Denying Motion to Suppress and Dismiss, No. 07-CR-10104-MLB, 2007 WL 2155657, at *1–*2 (D. Kan. July 25, 2007) (Doc. #27) (unpublished) ("Order").

According to the affidavit, CW #3 is a "documented member" of the Neighborhood Crips (NHC), a subset gang of the Crips, who has personal knowledge of its activities based upon his conversations with NHC members and associates, observations of NHC members and associates, and his own participation in some of NHC's criminal activities. The affidavit averred that "[m]uch of the information provided by CW #3 has been verified and deemed reliable through independent investigation such as police reports, recorded conversations, letters, interviews, telephone records, surveillance, undercover narcotics purchases and evidence

6

recovered in the execution of search warrants." Record on Appeal (ROA), vol.1, pt.2, at 303. In addition, the affidavit revealed that at the time CW #3 was in custody awaiting trial for possession of a firearm by a felon and indicated his desire to receive a reduced sentence in exchange for his cooperation.

Detective Goodwyn concluded that based on the facts he described, his experience, and training, he had probable cause to believe firearms, ammunition, telephone records, gang paraphernalia, and other evidence of gang activity would be found in Defendant's residence and that:

> [T]hese items will link members of the Crips and its sets, identified in this affidavit, and other known and unknown co-conspirators, to the distribution of narcotics, the collection of narcotics proceeds, the illegal possession and sale of firearms, and the laundering of monetary instruments. In addition, I have probable cause to believe that [Defendant's] residence . . . will contain valuable evidence of other criminal activities associated with the Crips and its sets, and that this evidence will establish membership and/or association within the criminal enterprise known as the Crips in violation of 18 U.S.C. § 1962 [Racketeer Influenced Corrupt Organizations Act (RICO)].

ROA, vol.1, pt.2, at 403.

After the federal magistrate signed the search warrant for Defendant's residence, Detective Goodwyn and other law enforcement officers executed the search on May 1, 2007. During their search of Defendant's residence, officers retrieved .25 and .22 caliber ammunition, cartridge rounds, miscellaneous documents, and cell phones, among other items. Subsequently, a Fifth Superseding Indictment charged Defendant and nineteen other individuals with RICO violations.

7

Specifically, Count 5 charged Defendant with possessing ammunition as a felon in violation of 18 U.S.C. § 922(g)(1).

Prior to trial, Defendant moved to suppress the evidence obtained during the search of his home and requested a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). Defendant contended the affidavit supporting the warrant did not provide probable cause and the good-faith exception to the exclusionary rule did not apply because the affidavit (1) deliberately or recklessly omitted material facts and, (2) lacked sufficient indicia of probable cause as it (a) failed to establish a nexus between the items sought and his residence, (b) presented stale information, and (c) relied on an unreliable confidential informant.

The district court conducted an evidentiary hearing on Defendant's motion. The court heard testimony from Detectives Reid, Chisolm, and Fatkin, all of whom had some involvement in the WPD's Barney homicide investigation. Detectives Relph and Goodwyn, both of whom were assigned to the Gang Task Force, also testified. At the conclusion of the hearing, Defendant additionally orally argued the WPD's behavior in preparing the affidavit constituted systemic negligence, precluding the application of the good-faith exception, because the affiant, Detective Goodwyn, had no personal knowledge of Defendant, relied entirely on others for his information, and, as a result, omitted material information.

The district court ultimately denied Defendant's motion in its entirety explaining:

8

> [T]he court finds that nothing seriously undermines good faith on the part of law enforcement. Further, there was nothing that would indicate deliberately misleading information, or information provided to the magistrate with reckless indifference to the truth.

United States v. Campbell, Order Denying Motion to Suppress and Request for a Franks Hearing as to Jermall Campell, No. 07-CR-10142-JTM, at *4 (D. Kan. Feb. 13, 2009) (Doc. #1037). The district court also incorporated by reference District Court Judge Belot's analysis and conclusion that the affidavit provided a substantial basis for the magistrate to determine probable cause existed and that, in any case, the officers who executed the search relied in good faith upon the warrant.[1] Judge Belot explained:

> The Goodwyn Affidavit supporting the search warrant was not so lacking in indicia of probable cause that the executing officer should have known that the search may have been illegal despite the magistrate's authorization. The executing officer could reasonably have believed that the evidence of [D]efendant's gang association,

_____

[1] In United States v. Campbell, No. 07-CR-10104-MLB, 2007 WL 2155657 (D. Kan. July 25, 2007) (unpublished), the Government charged Defendant with possessing ammunition as a felon in violation of 18 U.S.C. § 922(g)(1). Law enforcement discovered the ammunition that constituted the basis of that charge in Defendant's home pursuant to the same 2007 search warrant and affidavit presently at issue. Prior to trial, Judge Belot denied Defendant's motion to suppress. But Judge Belot ultimately granted the Government's motion to dismiss the case without prejudice. The Government later indicted Defendant again for the same offense and that case is now before us on appeal. The district court explained that out of an abundance of caution it refused to conclude collateral estoppel required it conform its ruling to that of Judge Belot's, but incorporated by reference Judge Belot's analysis. We therefore cite Judge Belot's order denying Defendant's motion to suppress the evidence seized pursuant to the 2007 warrant and affidavit here only because the district court provided Judge Belot's analysis as the explanation for its holding.

9

[D]efendant's criminal history, and the fruits of investigation into CW #3's allegations, along with officers' knowledge concerning the types of evidence generally maintained in the home by members of gangs, sufficiently linked criminal activity with [D]efendant's residence. The affidavit here is not so lacking in indicia of probable cause that the executing officers should have known the search was illegal despite the issuing judge's authorization.

Campbell, Order, No. 07-CR-10104-MLB, 2007 WL 2155657, at *1 (July 25, 2007).

II.

Defendant appeals the adequacy of the probable cause supporting the search of his home on many grounds. He also argues Leon's good-faith exception to the exclusionary rule does not apply because the affidavit (1) deliberately or recklessly contained false information and omitted material facts, (2) so lacked indicia of probable cause as to render official belief in the existence of probable cause unreasonable, and (3) compiled information in a systemically negligent manner. We follow the lead of wise panels before us and bypass the troublesome issue of whether probable cause supported the search warrant for Defendant's home because we conclude the executing officers acted in good-faith reliance upon the warrant. See United States v. Quezada-Enriquez, 567 F.3d 1228, 1230 (10th Cir. 2009) ("We do not address the thorny issue of whether the search warrant for Quezada-Enriquez's house was supported by probable cause because we conclude that officers executed the search in good faith."); United States v. Potts, 586 F.3d 823, 832 (10th Cir. 2009) ("We have previously taken this approach of assuming a deficiency without deciding the issue and applying Leon.").

A.

When we review a district court's denial of a motion to suppress, we "view the evidence in the light most favorable to the [G]overnment and uphold the district court's factual findings unless clearly erroneous." United States v. Roach, 582 F.3d 1192, 1200 (10th Cir. 2009). "'The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court.'" United States v. McKissick, 204 F.3d 1282, 1296 (10th Cir. 2000) (quoting United States v. Long, 176 F.3d 1304, 1307 (10th Cir. 1999)). Whether the good-faith exception applies is a question of law, however, which we review de novo. Roach, 582 F.3d at 1200.

If a warrant is not supported by probable cause, the evidence seized pursuant to the warrant "need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000) (citing Leon, 468 U.S. at 922). When an officer searches pursuant to a warrant, Leon generally requires we presume the officer acted in good-faith reliance upon the warrant. United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009); United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985). "It is only when [an officer's] reliance was wholly unwarranted that good faith is absent." Cardall, 773 F.2d at 1133. But this presumption is not absolute. Harrison, 556 F.3d at 1256. As we have reiterated many times, a warrant subsequently determined to lack probable

11

cause demands suppression of the resulting evidence in at least four situations: (1) when "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his 'reckless disregard of the truth'"; (2) "when the 'issuing magistrate wholly abandon[s her] judicial role'"; (3) "when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and, (4) "when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid." Danhauer, 229 F.3d at 1007 (quoting Leon, 468 U.S. at 923). Recently, the Supreme Court in United States v. Herring, 129 S. Ct. 695 (2009), appears to have described another situation in which Leon would not apply—when the warrant's flaw results from recurring or systemic police negligence. The Court explained "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring, 129 S. Ct. at 702. But when police error is the result of negligence, "rather than systemic error or reckless disregard of constitutional requirements," the exclusionary rule does not serve its purpose and, therefore, does not apply. Id. at 704.

B.

We first address Defendant's argument that the issuing magistrate was misled by the deliberate or reckless omission of material facts from the affidavit. Defendant claims the following facts were deliberately or recklessly omitted from the affidavit:

12

• An eyewitness to the Barney murder identified to the WPD two people she called P and J as the perpetrators of the Barney murder.
• Another individual informed the WPD that Barney's life had been threatened by a drug dealer, someone other than Defendant, the night before Barney was murdered.
• CW #1 told WPD that CW# 3, a known gang member, took the Barney murder weapon to CW #1, another known gang member, the morning after the murder.
• CW #1 told WPD the gun used to murder Barney belonged to Elton Profit, Jr., a.k.a. "PJ" another gang member.
• Defendant had only lived at the place searched for a short period of time. He lived at a different residence at the time of the murder and had been in prison during the interim period between the murder and the search.

See Aplt. Opening Br. at 21–22.

1.

First, Defendant contends the omissions resulted because Detective Goodwyn admittedly had no personal knowledge of the information presented in the affidavit concerning Defendant. Detective Goodwyn testified at the Franks hearing he relied entirely on the information provided by other law enforcement officers. ROA, vol.3, pt.1, at 149, 150. He stated he did not personally review any specific gang information to confirm that Defendant was in fact a gang member. Id. at 151. Detective Goodwyn also testified that before signing the affidavit he did not read the debriefings of either CW #1 or CW #3. Id. at 152. Furthermore, he never reviewed the WPD's file on the Barney murder. Id. at 149–150, 152.

Defendant also relies on the testimony of Detective Relph, a detective with the WPD assigned to the Gang Task Force, who debriefed CW #1 and CW #3. He testified everyone on the Task Force was assigned specific targets and that Defendant was his assigned target. Id. at 140. Detective Relph assisted in the preparation of

13

the affidavit and, specifically, had been asked to verify the affidavit's sections describing CW #1 and CW #3's statements. Id. at 126–27. Detective Relph testified that CW #3 stated that he drove Defendant to Barney, witnessed Defendant shoot Barney, and then drove Defendant away from the scene. Id. at 138. Detective Relph stated he was not asked to review the WPD Barney murder file as part of the affidavit's preparation, nor did he do so of his own accord. Id. at 127. Detective Relph explained he spoke with Detective Fatkin, the lead WPD detective on the Barney homicide. Id. at 127. Detective Relph admitted that he knew at some point in time prior to the affidavit's submission to the magistrate that Detective Fatkin was looking for two people, known as "P" and "J", in connection with the Barney murder. Id. at 128. Detective Relph testified CW #1 told him that the gun that shot Barney belonged to Elton Profit, Jr., who was later determined to use "Papa Joe" and "PJ" as aliases. Id. at 125. Detective Relph also stated that CW #1 told him that Lonnie Wade and his brother, CW #3, brought that gun to him after the murder. Id. at 133. Detective Relph stated that it was known among the task force that CW #1 had stated that the gun that shot Barney belonged to Elton Profit, Jr. also known as "PJ." Id. at 125, 126. But, Detective Relph testified he did not tell Detective Goodwyn that individuals known as "P" and "J" had been identified as suspects in the Barney murder. Id. at 129. He explained he did not relay this information "[b]ecause we had never identified P and J and the thought that P and J may be PJ, it may be but then again, it may not be." Id. at 129. And, whether Detective Relph relayed to

14

Detective Goodwyn that CW #1 stated Lonnie Wade and his brother, CW #3, brought

him the Barney murder weapon is not evident from hearing testimony.[2]

Detective Fatkin, the lead WPD detective on the Barney murder investigation,

also testified at the hearing. Terrika Holt told him she witnessed the Barney murder.

Id. at 94. Detective Fatkin explained that she told him she saw two males—one

drove the vehicle and the other shot Barney. Id. at 94. She said that she had ridden

in a car with these same two men before the murder and believed them to be

---

[2] At the hearing, Defendant's counsel directed Detective Relph to review the WPD's debriefing summary of the CW #3's interviews. Defendant's counsel asked:

> Q. Now go down 11 lines from the top, please. And there's a sentence that starts [CW #3] stated he assumed that L got rid of the gun. Is that what [CW #3] told you?
> A. Yes.
> Q. Was that consistent with what [CW #1] told you about who got rid of the gun?
> A. No, sir.
> Q. Did [CW #1] tell you that Lonnie [Wade] and [CW #3] brought the gun to him?
> A. Yes.
> Q. Did you provide these debriefings to Detective Goodwyn when he was preparing his warrant application?
> A. During that period of time, you know, we were having debriefings, did I – I can't tell you the exact date that we have – that we would have talked about what [CW #3] had said.
> Q. All right. Do you recall if you sat down with him and went over these paragraphs about what is in the summary concerning [CW #3]?
> A. Did I go over this with Detective Goodwyn?
> Q. Yes.
> A. No, sir.

ROA, vol.3, pt.1, at 133–34. According to the presentence report, one of Defendant's street aliases is "L."

15

brothers.  Id. at 92, 94.  According to Detective Fatkin, she repeated what she had seen and described the two assailants to an individual named Lavirgil Jones shortly after the murder because she did not know the two men's names.  Id. at 92.  Detective Fatkin testified Holt told him that Jones told her, based on her description of the two men, that she had seen "P" and "J."  Id.

Defendant argues this testimony reveals the police acted at least with reckless indifference to the truth.  Defendant asserts the officers Detective Goodwyn relied upon failed to report the entire results of the Barney murder investigation and other material facts described above to Detective Goodwyn as a result of their reckless indifference to the truth.  He maintains that the magistrate was consequently misled by the collective efforts of the law enforcement officers who collaborated in preparing the affidavit.

2.

We exclude evidence discovered pursuant to a search warrant when (1) a defendant proves by a preponderance of the evidence "the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) . . . after excising such false statements and considering such material omissions . . . [we conclude] the corrected affidavit does not support a finding of probable cause."  United States v. Garcia-Zambrano, 530 F.3d 1249, 1254 (10th Cir. 2008) (citing Franks, 438 U.S. at 155–56); see also McKissick, 204 F.3d at 1297 (explaining that the opponent to a

16

search warrant bears the burden of proving by a preponderance of the evidence that the affidavit supporting the warrant contained deliberate or reckless false information or material omissions). Notably, we hold the Government "accountable 'for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit.'" Garcia-Zambrano, 530 F.3d at 1258 n.6 (quoting United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997)); see also Leon, 468 U.S. at 923 n.24 (admonishing that in applying the good-faith exception "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination"); McKissick, 204 F.3d at 1297 ("The standards of deliberate falsehood and reckless disregard set forth in Franks apply to material omissions, as well as affirmative falsehoods."). But negligence or innocent mistakes are insufficient to justify the exclusion of evidence. United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004)). As the Supreme Court first explained in Franks v. Delaware, 438 U.S. 152, 170 (1978), the rule of exclusion does not extend "beyond instances of deliberate misstatements, and those of reckless disregard, leav[ing] a broad field where the magistrate is the sole protection of a citizen's Fourth Amendment rights, namely, in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination."

17

On appeal, we review the district court's ultimate determination that the corrected affidavit supports a finding of probable cause de novo "but accept the district court's factual findings unless clearly erroneous." Garcia-Zambrano, 530 F.3d at 1254 (citing United States v. Avery, 295 F.3d 1158, 1167 (10th Cir. 2002)). In particular, we review only for clear error the district court's determinations "regarding the truth or falsity of statements in the affidavit and regarding the intentional or reckless character of such falsehoods." Id. "We will not reweigh the evidence presented to the district court, second guess the district court's credibility assessments, or question 'reasonable inferences' the district court drew from the evidence." Avery, 295 F.3d at 1167. The Supreme Court has explained that where "the district court's account of the evidence is plausible in light of the record viewed in its entirety" we may not reverse it, even if we are convinced that we would have made a different decision as the trier of fact. Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id.

3.

After hearing testimony from five witnesses and receiving twenty-four exhibits, the district court denied Defendant's motion to suppress, explaining that "there was nothing that would indicate deliberately misleading information, or information provided to the magistrate with reckless indifference to the truth." Our review of the record reveals this is not a clearly erroneous view of the facts. We

18

caution that the police may not insulate one officer's deliberate or reckless misstatement or material omission simply by relaying it through an officer-affiant personally ignorant of its falsity or existence. See Franks, 438 U.S. at 163 n.6 ("[T]he Court took as its premise that police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity."); see also Kennedy, 131 F.3d at 1258 (explaining that "the government is held accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately misleading insofar as such statements were relied upon by the affiant in making the affidavit"). The district court in this case, however, could have permissibly concluded that the less than seamless communication among members of the Gang Task Force and the WPD resulted from negligence rather than reckless indifference to the truth or a deliberate intent to deceive the magistrate. The case is not, as Defendant seems to suggest, that no one verified the information contained in Detective Goodwyn's affidavit. Instead, different members of the Gang Task Force were assigned targets. Part of that assignment included verifying all of the information contained in the affidavit about that target. Detective Relph testified at the evidentiary hearing that Defendant was his assigned target and that he verified the information in the affidavit relating to Defendant. Defendant's suggestion that no one involved in the preparation of the affidavit consulted the Barney homicide detectives is simply incorrect. Detective Relph testified that he spoke with Detective

19

Fatkin, the lead detective on the Barney homicide case. ROA, vol.3, pt.1, at 127. Other than the existence of the omissions themselves, we conclude Defendant has not revealed or provided any evidence in the record of an intent to mislead or recklessness on the part of the officers. Consequently, Defendant has failed to meet his burden of proof.

Moreover, we are not convinced that the omitted facts Defendant recites would have altered the magistrate's probable-cause determination. See Garcia-Zambrano, 530 F.3d at 1254 (explaining that we exclude evidence procured pursuant to a affidavit containing false statements or material omissions only once we conclude that "after excising such false statements and considering such material omissions . . . the corrected affidavit does not support a finding of probable cause"). First, we must keep in mind that the question is not whether the affidavit established probable cause to believe that evidence of the Barney murder would be found in Defendant's home. Rather, the question is whether the affidavit presented probable cause to believe evidence of the criminal activities of, and Defendant's membership in, the criminal enterprise known as the Crips and its subsets in violation of RICO would be found in Defendant's home. ROA, vol.1, pt. 2, at 403. Therefore, that a witness identified two men as Barney's assailants whom she had been told were named "P" and "J" but in fact could not name herself or that another witness heard a man other than Defendant threaten Barney the night before his murder is not nearly as significant as Defendant argues. In addition, that CW #3, a gang member, brought

20

the Barney murder weapon, which allegedly belonged to another gang member, to CW #1, also a gang member, after the murder is not inconsistent with CW #3's statement that he saw Defendant shoot Barney and then drove Defendant away from the scene. If anything, taking those two pieces of information together suggests this murder was part of the Crips' criminal activity and Defendant was involved. Second, regarding the other omissions Defendant mentions, Judge Belot aptly explained:

> [T]he fact that [D]efendant was incarcerated for a period of time the Goodwyn Affidavit covers would've been obvious to the issuing magistrate judge as the Goodwyn Affidavit alerted the magistrate judge of [D]efendant's guilty plea to arson and criminal possession of a firearm. The convictions surely are obvious in their implication for imprisonment. Finally, the fact that [D]efendant had lived in his residence for a 'short period of time' does not change the fact that the evidence for which the search warrant was issued is likely to be kept in the home, wherever the home may be.

Campbell, Order, No. 07-CR-10104-MLB, 2007 WL 2155657 at *7 (July 25, 2007). For these reasons, we cannot say the district court clearly erred in concluding the police did not deliberately or recklessly omit material facts.

C.

Defendant argues the affidavit so lacked indicia of probable cause that the executing officers' belief in its existence was entirely unreasonable, precluding the application of Leon's good-faith exception, because it failed to establish he was involved in any criminal activity or establish a nexus between the evidence sought and his home, presented solely stale evidence, and improperly relied on a confidential informant. As we have explained, we generally presume officers

21

executed a search warrant in objective good faith. United States v. Henderson, 595 F.3d 1198, 1201 (10th Cir. 2010). This presumption, however, does not apply when the warrant was "'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. (quoting Leon, 468 U.S. at 923). Officers' reliance is only "'entirely unreasonable'" when the affidavit is "'devoid of factual support.'" Id. at 1201–02 (quoting Cardall, 773 F.2d at 1133)).

1.

To support his argument the affidavit fails to establish his involvement in criminal activity or establish a nexus between the evidence sought and his home, Defendant argues the only specific reference to his being associated with a gang, the Neighborhood Crips (NHC) in particular, is in a parenthetical on the page that lists the affidavit's targets: "(3) Jermall L. Campbell, b/m, DOB 12/23/1981 (NHC)." The affidavit stated the WPD had identified Defendant and thirty-three other individuals as gang members "through investigative methods such as reviewing of police reports, information gathered by the [WPD] gang officers, interviews of gang members and associates, surveillance, phone records, and undercover operations utilizing confidential informants" without stating which specific method or facts led the WPD to believe Defendant is a member of the NHC. ROA, vol.1, pt.2, at 295. Defendant asserts the rest of the affidavit's references to him do not demonstrate he was associated with the NHC. He claims most of the affidavit's references to him do not report criminal activity perpetrated by him. The few that do, he maintains

22

concern minor drug offenses. Although Defendant concedes three of the affidavit's eight references to him mention drugs, he argues those three do not demonstrate he possessed drugs or engaged in their distribution. Moreover, he asserts nothing in the affidavit suggests that his arson and firearms possession convictions were Crips related. As to CW #3's statement that Defendant shot Barney, Defendant contends the statement is unsubstantiated and, regardless, the affidavit does not indicate CW #3 claimed the murder was gang related. Even assuming some of his past acts were demonstrably gang related, Defendant argues evidence of past gang membership, by itself, does not support a reasonable suspicion of a crime.

In addition, Defendant argues the affidavit provided no basis to infer police would find evidence of criminal conduct at his home. Defendant notes the police had information that CW #3 delivered the Barney murder weapon to CW #1 just after the murder in July 2006. As a result, Defendant claims, police could not reasonably expect to find at his home the only specific physical evidence of the murder mentioned in the affidavit. Furthermore, Defendant asserts the affidavit notably lacked any observations of drug trafficking or other criminal activity outside or inside Defendant's home.

Officers' reliance on a magistrate's issuance of a warrant is only "'entirely unreasonable'" when the affidavit is "'*devoid* of factual support.'" Henderson, 595 F.3d at 1201–02 (quoting Cardall, 773 F.2d at 1133). An affidavit is not devoid of factual support "if it 'establishe[s] a minimally sufficient nexus between the illegal

23

activity and the place to be searched.'" Id. at 1202 (quoting United States v. Gonzales, 399 F.3d 1225, 1230–31 (10th Cir. 2005)). This minimal nexus requirement does not require that "hard evidence or 'personal knowledge of illegal activity' link a Defendant's suspected unlawful activity to his home." United States v. Biglow, 562 F.3d 1272, 1279 (10th Cir. 2009). On the contrary, an affidavit establishes a sufficient nexus when it "'describes circumstances which would warrant a person of reasonable caution' in the belief that 'the articles sought' are at a particular place." Id. (quoting United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 874 (10th Cir. 1992)). "[F]actors relevant to our nexus analysis include" but are not limited to "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." Id. Furthermore, magistrates may permissibly rely on law enforcement officers' opinions regarding where contraband or evidence may be kept. Id. And, as we have said before, "it is merely common sense that a drug supplier will keep evidence of his crimes at his home." United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009) ("[W]hen police officers have probable cause to believe that a suspect is involved in drug distribution, there is also probable cause to believe that additional evidence of drug-trafficking crimes (such as drug paraphernalia or sales records) will be found in his residence.").

As we stated at the outset, we make no conclusion as to whether the affidavit

established a sufficient nexus to support probable cause in this case. Rather, we bypass that inquiry and conclude the good-faith exception applies. In United States v. Roach, 582 F.3d 1192, 1202, 1203 (10th Cir. 2009), we concluded an affidavit did not articulate facts sufficient to establish actual probable cause to believe a defendant lived at the location searched because the affidavit only stated: "'[O]fficers have verified that the individuals listed below live at the following addresses, through investigations, which included checking for utilities information, driver's license records, real estate records, [WPD] records, tax records, social security records, U.S. Postal Service records, interviews and/or surveillance'" without revealing "which of these methods was, in fact, used by police to connect [the defendant] to the premises [searched]."[3] Nonetheless, we applied the good-faith exception, explaining the affidavit established a "minimal nexus" because the affidavit declared the police had verified the defendant lived at the premises searched through one of the various means listed, thereby providing adequate indicia of probable cause. Id. at 1204. Likewise, Detective Goodwyn stated in his affidavit the WPD had verified Defendant's gang membership through at least one of the specific investigatory methods listed. Detective Goodwyn's affidavit also provides other statements

_____

[3] In Roach, we considered a probable cause challenge to a search authorized by the same warrant and supporting affidavit at the heart of this case. Of course, Roach addressed the constitutionality of an entirely different search of another individual's home. We therefore do not suggest we are bound by Roach's conclusions as to the legal consequences of the specific facts presented in that case. We cite it solely for its relevant and precedential legal reasoning.

25

besides the parenthetical and general statement regarding the WPD's verification of Defendant's gang membership to support its conclusion that probable cause existed to believe evidence of Crips' membership and criminal activity would be found in his home. The affidavit documents eight incidents of Defendant's criminal activity, association with known gang members, or connection with drugs, and, in one instance, participation in murder. Thus, "[t]he executing officer could reasonably have believed that the evidence of [D]efendant's gang association, [D]efendant's criminal history, and the fruits of investigation into CW #3's allegations, along with officers' knowledge concerning the types of evidence generally maintained in the home by members of gangs, sufficiently linked criminal activity with [D]efendant's residence." Campbell, No. 07-CR-10104-MLB, 2007 WL 2155657, at *8 (July 25, 2007). In light of all the facts presented in the affidavit and the reasonable inferences therefrom, we too cannot say the affidavit is devoid of factual support and, consequently, lacked indicia of probable cause such that the executing officers should have known that the search was illegal despite the magistrate's authorization. Therefore, the officers executing the warrant reasonably relied on the magistrate's authorization.

2.

Defendant also argues the affidavit lacks indicia of probable cause sufficient to justify the executing officers' reliance because it presents only stale information. He contends the affidavit reports an unrelated series of incidents taken from police

26

reports four to ten years old. Defendant additionally notes he served a prison sentence from September 15, 2006 to January 3, 2007 and his family had only resided at the target residence for a few months, making it unlikely police would find any contraband or evidence of prior criminal activity at the residence.

In rejecting Defendant's argument that the affidavit presented stale information, the district court incorporated Judge Belot's explanation that:

> The Goodwyn Affidavit alleges ongoing gang association, and establishes [D]efendant's participation in street gang activity over a period of years. The search warrant sought, among other things, the type of information (*i.e.*, records of transactions, gang paraphernalia) that are maintained in a residence over a lengthy period of time. The Goodwyn Affidavit also, however, alleges [D]efendant's involvement in the recent murder of David Barney in July 2006, which ties [D]efendant to recent criminal activity.

Campbell, Order, No. 07-CR-10104-MLB, 2007 WL 2155657, at *5 (July 25, 2007) (citations omitted).

Information's staleness "depends upon 'the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.'" United States v. Ricarrdi, 405 F.3d 852, 860–61 (10th Cir. 2005) (quoting United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)). "'[O]ngoing and continuous activity makes the passage of time less critical when judging the staleness of information upon which a search warrant is based,' . . . because evidence of a longstanding pattern of repeated activity makes it less likely that the activity has ceased within a short time frame." Roach, 582 F.3d at 1201 (quoting United States v. Mathis, 357 F.3d 1200,

27

1207 (10th Cir. 2004)). In addition, "otherwise stale information may be refreshed by more recent events." United States v. Cantu, 405 F.3d 1173, 1178 (10th Cir. 2005). We need not decide whether the affidavit's information on Defendant was so stale as to not support probable cause because we conclude the affidavit provided sufficiently recent information to support the executing officers' reliance on the magistrate's authorization. In Roach, we concluded Detective Goodwyn's affidavit presented stale information as to a different defendant because the most recent evidence of gang-related criminal activity by that defendant occurred approximately five years prior to the search. Roach, 582 F.3d at 1202. Regardless, we noted that the defendant's "past course of criminal conduct [which the affidavit recounted] was unusually long," spanning nearly ten years. Id. at 1204. We explained in light of that fact and:

> [T]he dearth of cases in our circuit holding that particular information was so stale as to vitiate probable cause, an officer with reasonable knowledge of the law might have concluded, until today, that [the defendant's] decade-long involvement in gang-related crimes logically meant that he would continue to be involved in such crimes and to retain evidence of them at his residence. Moreover, the affidavit demonstrated that many of his past associates continued to be involved in such crimes, which adds at least some weight to such a conclusion. . . . We conclude that the officers' reliance was in good faith despite the staleness of the evidence.

Id. (citations omitted). Similarly, Detective Goodwyn's affidavit recounts alleged gang-related activity and other criminal activity by Defendant spanning nearly nine years. The affidavit also alleged Defendant's involvement in a murder less than a

28

year before the magistrate issued the warrant. The officers searched Defendant's home pursuant to this warrant in May 2007; we did not issue <u>Roach</u> and its guidance on what constitutes stale information until 2009. Given these facts and the reasoning of <u>Roach</u>, even assuming the affidavit's information was so stale as to not establish probable cause with regard to Defendant, we conclude the affidavit's information nonetheless provided sufficient indicia of probable cause to justify the officers good-faith reliance.

3.

Defendant lastly contends the affidavit lacked indicia of probable cause because the affidavit fails to establish CW #3's veracity, reliability or basis of knowledge and that this failure is fatal to the application of the good-faith exception because CW #3's accusation provided the most recent allegation of criminal activity by Defendant. Defendant also asserts CW #3's admitted involvement in the Barney shooting and desire for a lower sentence in a separate criminal case provide obvious motives to fabricate. Moreover, the affidavit did not disclose CW #3's complicity in disposing of the murder weapon, which Defendant argues cuts against his reliability and veracity.

Veracity, reliability, and basis of knowledge are extremely relevant factors in deciding whether a tip can support probable cause. <u>Quezada-Enriquez</u>, 567 F.3d at 1233 (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 230 (1983)). Generally, "[w]e evaluate whether these factors as revealed by the facts in the affidavit create 'a fair

probability that contraband or evidence of a crime will be found in a particular place' on consideration of the totality of circumstances." Id. (quoting Gates, 462 U.S. at 238). As a result, "a deficiency in one factor may be compensated for by a strong showing of another." Id.

In Quezada-Enriquez, we were presented with the question of whether a confidential informant's tip that he had seen the defendant with a gun that the defendant kept in his vehicle and home supported probable cause. The informant told an Alcohol, Tobacco, Firearms and Explosives (ATF) agent "that [the defendant] was an undocumented immigrant of Mexican nationality; described [the defendant]'s age and physical appearance; identified the make, model, and license of his vehicle . . .; and provided the address of his residence." Id. at 1230–31. The affidavit supporting the search warrant of the defendant's home averred "this informant was 'a credible and reliable ATF documented confidential informant (CI), who is not working off criminal or other charges and who's [sic] information in the past has led to the seizure of various quantities of illegal narcotic substances, amounts of U.S. currency, firearms and ammunition.'" Id. at 1231. The affidavit provided no other information about the informant or his information. We explained that "although not explained in particular detail in the affidavit, this informant apparently had a track record of reliability and some indication of veracity." Id. at 1234. The affidavit stated that the informant "was receiving no benefit for providing information and had provided accurate information about criminal activity on past occasions." Id.

Therefore, regardless of the fact that the affidavit did not describe the informant's basis of knowledge or if the police corroborated the tip, we concluded the affidavit was not so lacking in indicia of probable cause as to render the executing officers' reliance on the warrant unreasonable. Id. at 1235.

In the case at hand, in contrast to Quezada-Enriquez, the affidavit did set forth CW #3's basis of knowledge. The affidavit states he admitted to being present when Defendant shot Barney. "[A] firsthand observation is entitled to greater weight than secondhand information." Quezada-Enriquez, 567 F.3d at 1233. Furthermore, the affidavit also states CW #3 is a documented NHC street gang member, which Defendant does not dispute, and has "personal knowledge" of the facts in his statements to the WPD based upon his direct conversations with members and associates of the NHC, his observations of members and associates of the NHC, and his admitted participation in some of the NHC's criminal activities which he describes. It fully discloses the fact CW #3 desired a lower sentence in a separate criminal case in exchange for his cooperation, but had not yet been provided a benefit for his cooperation. And, though the affidavit did not provide specifically how law enforcement verified or deemed reliable CW #3's statement that Defendant killed Barney, it did represent that much of CW #3's "information has been verified and deemed reliable through independent investigation such as police reports, recorded conversations, letters, interviews, telephone records, surveillance, undercover narcotics purchases and evidence recovered in the execution of search

31

warrants." ROA, vol.1, pt.2, at 303. The affidavit thus provided some information about CW #3's reliability, veracity, and basis of knowledge.

Additionally, we must again point out that we are not presented with whether the affidavit provided indicia of probable cause to believe evidence of the Barney murder would be found at Defendant's residence. Instead, we must determine whether the affidavit *as a whole* provides indicia of probable cause to believe evidence of Defendant's participation in the Crips criminal enterprise would be found in his home. The affidavit did not rely solely on CW #3's statement that Defendant shot Barney to establish probable cause to believe evidence of Crips' criminal activity would be found in Defendant's home. Were the facts otherwise we might have to grapple with the troublesome reality that the affidavit does not provide any specific evidence of CW #3's reliability or veracity, preventing the magistrate from independently determining whether his accusation supports probable cause and, thus, perhaps, failing to provide sufficient indicia of probable cause to justify officers' good-faith reliance upon the warrant. But as the case stands, CW #3's statement that he witnessed Defendant shoot Barney in conjunction with the affidavit's statements that much of CW #3's information had been verified through traditional investigative techniques and the affidavit's other facts indicating Defendant's involvement in gang activity over nearly nine years reveal the affidavit was not devoid of factual support. We therefore conclude the affidavit provided sufficient indicia of probable cause to justify the executing officers' good-faith

32

reliance upon the magistrate's issuance of the search warrant.

D.

Defendant also maintains the affidavit's flaws resulted from law enforcement's systemic negligence, thereby precluding the application of Leon's good-faith exception to the exclusionary rule. No one officer undertook the task of verifying the evidence offered in support of the search warrant application or determining whether material information had been omitted. Admittedly, Detective Goodwyn did not have personal knowledge of any of the affidavit's assertions involving Defendant. He relied on other law enforcement officers to supply him information. Defendant asserts no one asked the lead WPD detective on the Barney murder about his investigation. As a result, the affidavit did not inform the magistrate that two WPD officers knew an eyewitness had identified two other suspects as the Barney assailants or that an individual reported a man other than Defendant threatened Barney the night before he was murdered. Defendant asserts this constitutes systemic negligence on the part of the Gang Task Force and the WPD. We disagree.

Defendant has demonstrated at most a *single* instance of an arguably negligent breakdown in communication among the WPD. He has not demonstrated what the Supreme Court appears to have indicated is required—"*recurring* or *systemic* negligence." Herring, 129 S. Ct. at 702, 704 (explaining that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but when police error is the result

of negligence, "rather than systemic error or reckless disregard of constitutional requirements," the exclusionary rule does not serve its purpose and, therefore, does not apply) (emphasis added). Moreover, the case is not, as Defendant seems to suggest, that no one in the Task Force or WPD had the task of verifying the information contained in Goodwyn's affidavit. Instead, hearing testimony revealed different members of the Gang Task Force were assigned targets. Part of that assignment included verifying all of the information contained in the affidavit about that target. Detective Relph testified that Defendant was his assigned target and that he verified the information in the affidavit relating to Defendant. Contrary to Defendant's suggestions, it is also not the case that no one involved in the preparation of the affidavit consulted the Barney homicide detectives. Detective Relph testified that although he did not review the Barney murder file, he spoke with Detective Fatkin, the lead detective on the Barney homicide case. ROA, v.3, pt.1, at 127. Detective Relph explained that as a result of his conversation with Detective Fatkin he was aware of an eyewitness's identification of two individuals she thought were named "P" and "J" as the Barney assailants. Id. at 142. However, Detective Relph testified he believed the eyewitness's report, relayed to him by Detective Fatkin, that one young man drove the get-away vehicle and another shot Barney was consistent with CW #3's statement that he drove Defendant to and from the scene and that Defendant shot Barney and with CW #1's statement that CW #3 brought him the Barney murder weapon. Id. at 143. Furthermore, nothing in the testimony even

34

suggests the Task Force or WPD had a policy or practice of failing to verify information contained in other affidavits. We therefore find nothing in the record suggests the kind of recurring or systemic negligent conduct by law enforcement occurred that precludes the application of the good-faith exception to the exclusionary rule.

The judgment of the district court is hereby **AFFIRMED.**