FILED
United States Court of Appeals
Tenth Circuit

May 2, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

FLORENTINO VILLANUEVA, JR.,

      Defendant - Appellant.

No. 14-6081

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:13-CR-00201-HE-1)**

---

David Autry of Oklahoma City, Oklahoma, for Defendant-Appellant.

Mark R. Stoneman, Special Assistant U.S. Attorney (Sanford C. Coats, United States Attorney, with him on the brief), of Lawton, Oklahoma, for Plaintiff-Appellee.

---

Before **LUCERO**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Following the execution of a search warrant, Florentino Villanueva, Jr., was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court denied his motion to suppress the firearm seized during the search. Mr. Villanueva entered a conditional plea of guilty pursuant to a written plea agreement, reserving the right to appeal the denial of his motion to suppress and any sentencing enhancement the district court might impose under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). The district court overruled Mr. Villanueva's objections at sentencing, classified him as an armed career criminal, and sentenced him to 210 months imprisonment. We affirm.

## FACTS AND PROCEDURAL HISTORY

*A. The Affidavit for Search Warrant*

Based on information obtained during an investigation into on-going methamphetamine trafficking, Agent Seth Thompson of the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD) applied for and received a no-knock warrant to search a residence in Lawton, Oklahoma. Agent Thompson asserted there was probable cause to believe that Mr. Villanueva used the residence to run a suspected methamphetamine drug conspiracy. The residence "had belonged to Mr. Villaneuva's deceased grandfather and was left to his two sons, one of whom

was Mr. Villaneuva's stepfather."[1] Aplt. Br. at 9. After laying out his training and experience as a narcotics agent and explaining the common practices of drug distributors and traffickers, Agent Thompson set forth the following information about Mr. Villanueva's alleged drug trafficking conspiracy obtained through wiretaps and surveillance of Mr. Villanueva and of several of his alleged co-conspirators[2] and others close to him.

On September 11, 2012, OBNDD agents intercepted cell phone communications via wiretaps suggesting Mr. Villanueva issued orders to co-conspirators as the leader of a drug hierarchy in which other individuals carried out his orders. Cell phone communications intercepted on September 20, 2012, showed co-conspirators Hinson and Martinez discussing their belief that Hinson was under police surveillance and that Mr. Villanueva, referred to in this conversation by one of his aliases, "G-B," wanted Hinson to stop the alleged drug activity and possibly no longer show up at All-Star Automotive, an auto repair

---

[1] As Agent Thompson noted in the probable cause affidavit, the house is listed as formerly owned by Thayer Eugene Bizzell, now deceased, survived by two sons, one of whom is Charles Bizzell, married to Mr. Villanueva's mother, Mary Bizzell. Comanche County Clerk's records show the home was distributed in a probate case to Thayer's two sons, Michael and Charles Bizzell.

[2] Agent Thompson gathered information about numerous co-conspirators but three specific ones – Frederick Martinez, Jimmy Hinson, and Mr. Villanueva's brother, David Villanueva – most frequently appear in the affidavit in connection with Mr. Villanueva. The affidavit lists many other individuals suspected of conspiracy to distribute drugs, but only information related to Mr. Villanueva's conviction is relevant here.

shop co-owned and operated by Mr. Villanueva. The co-conspirators also discussed how to reassign Hinson's customer base to new locations for further drug sales, and how to get money from drug sales to Mr. Villanueva because Hinson owed "ten-fifty," or $1,050.00, to Mr. Villanueva. Rec., vol. I at 139. Additionally, on September 21, 2012, during the same surveillance session, Hinson turned down a deal to sell forty dollars worth of methamphetamine, stating that he had been "cut off," allegedly by Mr. Villanueva, and that "the police are all over me." *Id.* at 139.

On September, 24, 2012, co-conspirators discussed whether Mr. Villanueva, referred to in this conversation as the "big fella,"[3] had given Hinson permission to resume selling methamphetamine. On October 9, 2012, Mr. Villanueva had a telephone conversation with Martinez in which they determined Martinez owed him "thirty three," or $3,300.00, allegedly for methamphetamine. *Id.* at 141. Later that night, Mr. Villanueva called Martinez and instructed him to prepare two bags of meth – one with 14 grams and the other with 4 grams – to be ready by around 9:30 p.m. He also told Martinez that he had "three-forty for [him] to pick up from Satan," indicating that Mr. Villanueva had $340.00 worth of methamphetamine from Satan, referred to in the affidavit as co-conspirator

---

[3] The affidavit noted that "big fella" was a reference to Mr. Villanueva's physical appearance as well as one of his aliases, "Gordo," which according to the affidavit "is the Spanish word for fat." Rec., vol. at 50, 140.

Seth Speed.[4]  *Id.*

Roughly thirty minutes later, Mr. Villanueva called Martinez and told him that the four-gram bag would be ready in an hour and a half, and the fourteen-gram bag would be ready around 11:00 p.m.  At around 11:15 p.m., Mr. Villanueva called Martinez and told him to come over to his house and grab his phone because he was having trouble staying awake and the woman would not be able to pick up the drugs until 11:30 p.m.  Martinez said he would be there shortly, and nine minutes later he called Mr. Villanueva, stating: "I'm at the front door."  *Id.* at 142.  At this time, global position data (ping data) from Martinez's phone showed that he was located at Mr. Villaneuva's stepfather's residence, the house subsequently searched.

A series of conversations outlined in the affidavit took place later that same night between Mr. Villanueva and Martinez, in which Mr. Villanueva specifically coordinated two drug sales over the phone by speaking to both Martinez and the customers while giving Martinez instructions on how to distribute the methamphetamine.  During those cell phone calls, Mr. Villanueva instructed Martinez to make two drug deals at a McDonald's, one with a white trailblazer,

---

[4] Agent Thompson noted in the affidavit that "this statement further evidences the nature of this conversation when" considered in the context of a call recorded by police occurring twenty-seven minutes after the call from Mr. Villanueva to Martinez in which Speed told Martinez that he gave G-B "three forty" and Martinez told Speed that he didn't think G-B knew Martinez was fronting methamphetamine to Speed.

and one with "a Mexican chick" described as "Flacco's sister" who drove a "gray Mazda 6." *Id.* at 143. In a subsequent phone conversation, Mr. Martinez told Mr. Villanueva, "Mission accomplished" and added, "She gave me some feria (money). She said it was a rack. So we wrapped it up."[5] *Id.* Mr. Villanueva then told Martinez, "Hold on to it, and I'll see you tomorrow." *Id.*

On October 13, 2012, Martinez received a call from David Villanueva, Mr. Villanueva's brother, concerning the preparation of methamphetamine. David told him that Mr. Villanueva, referred to as "Gordo" in this conversation, wanted Martinez to "get on top of that chop suey you make," and to "snatch up 'Little C' if you need to, at the shop, and y'all go chop." *Id.* at 145. The affidavit points out that "cutting," "chopping," and the phrase "get on top of that chop suey," are all slang terms used for preparing methamphetamine. *Id.* at 145-46. In a phone conversation thirty-six minutes later, Mr. Villanueva asked Martinez if he had talked to "Little C" yet, and Martinez said he hadn't but he was going to "hit up Little C, so we can go take care of that." *Id.* According to phone wiretaps, Martinez then called Little C, also known as Colten Payton, to ask if he was busy because Martinez needed Little C to help him if he had time. *Id.* About an hour after this call, Martinez spoke with his brother and asked him to come "cut the

---

[5] The affidavit has a section listing key words allegedly used by the drug trafficking conspiracy run by Mr. Villanueva, including "Fatia," "Fierja," "Bread," and "Rack," which according to Agent Thompson all translate to "Money." Rec., vol. 1 at 81.

tree down" at their dad's house, and then Martinez stated: "Yea, we got all them little wild onions and shit that are growing down there, and I gotta pull them up," and "see if they're any good." *Id.* "[T]he word 'onion' is a term used in the drug community to refer to one ounce of illegal drugs." *Id.* at 146. That same night, David Villanueva told Martinez on the phone that he and Mr. Villanueva, "G-B," were at "grandpa's house,"[6] and that Mr. Villanueva might pass out. Martinez said he would pick up David if he needed a ride. Although no further cell phone communication took place between David Villanueva and Martinez that night, ping cell phone data showed that Martinez's phone was within five meters of "grandpa's house" in Lawton at 10:25 p.m.

On October 16, 2012, additional intercepted wiretap communications clearly showed Martinez speaking to an unknown male about the fact that he owed "G-B" "seventeen-fifty," or $1,750.00, and Mr. Villanueva can be heard in the background during the call telling Martinez to tell the unknown male where to meet Martinez to give him the money for Mr. Villanueva.

Finally, throughout the month of January 2013, agents observed several vehicles owned by individuals associated with Mr. Villanueva, including his wife and girlfriend, parked at the residence in question. Agent Thompson also

---

[6] Again, the reference to grandpa's house connects Mr. Villanueva to the residence eventually searched. The County records, *see* n.1, *supra*, confirmed the statement made by David Villanueva telling Martinez that he and "G-B" were at "grandpa's house." Rec., vol. 1 at 52.

observed Mr. Villanueva driving his wife's vehicle during wiretaps and saw it parked outside of his auto repair shop, All-Star Automotive. In summary, Agent Thompson explained:

> The approximately seventeen (17) days of telephone interception conducted by OBNDD on Martinez's two (2) telephones produced collectively 646 calls/communications relevant to the offense under investigation. These two (2) wiretaps, as well as a previous wiretap involving the phone of one of Martinez's sub-distributors, Jimmie Hinson (which produced 1,735 calls/communications relevant to the offense under investigation), identified in excess of thirty (30) individuals being involved with Mr. Villanueva's methamphetamine distribution organization. The totality of this investigation has confirmed that a conspiratorial network has existed for a number of years, and this network has distributed methamphetamine in the Comanche County area. As described herein, including attachments, the residence . . . is used by Mr. Villanueva as one of his residences. As previously stated, drug distributors often use their residences to store document and/or paraphernalia equipment evidence indicative of their involvement in the illegal drug trade.

Rec., vol. 1 at 55.

*B. The Search Warrant*

On January 30, 2013, Oklahoma state court Judge Keith Byron Aycock issued a no-knock search warrant for "grandpa's house," the residence owned by Mr. Villaneuva's stepfather. The warrant authorized the search for "books, records, documents, contraband and paraphernalia evidencing the business of illegal drug distribution and laundering profits from this enterprise."[7] *Id.* at 201.

---

[7] Attachment B set forth an extensive list of documents to be searched for, including bank records, cash receipts, telephones records, emails, stored

(continued...)

Agents executed the search warrant at the residence in Lawton, Oklahoma, on February 1, 2013, and seized, among other things, a loaded Springfield Model XD .40 caliber firearm in the master bedroom.

*C. Court Proceedings*

A federal grand jury indicted Mr. Villanueva on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Mr. Villanueva filed a motion to suppress evidence seized during the search, contending that Judge Aycock was not a neutral and detached magistrate when he issued the search warrant; that the warrant was not supported by probable cause, did not meet the particularity requirement, and was improperly executed; and that the good faith exception did not preclude excluding the evidence.  The district court held a suppression hearing in which Mr. Villanueva called one witness, Clay Hillis, who had represented Mr. Villanueva on four previous occasions and who had also represented Mr. Villanueva's son in a paternity case.  Mr. Hillis testified that the judge assigned to the paternity case was Judge Aycock.  Mr. Hillis told the opposing attorney in the paternity case that he intended to move to have Judge Aycock recused because he was concerned the judge "had either prosecuted [Mr.

---

[7](...continued)
electronic communications between co-conspirators, investment records owned by Mr. Villanueva or All-Star Automotive, as well as computer storage devices, business and financial documents, cash, drug paraphernalia and other evidence concerning the production, packaging, and distribution of any illegal narcotics.

Villanueva] directly himself, or that he was part of a district attorney's office that had prosecuted him."[8]  Rec., vol. 3 at 7.  Instead, Mr. Hillis explained, both he and opposing counsel jointly asked Judge Aycock to recuse and "he said he would recuse."  *Id.*  "It was a pretty easy deal," Mr. Hillis added, but noted he wasn't "positive" if Judge Aycock set forth his reasons for disqualifying himself from handling the case.  *Id.*

On cross-examination, Mr. Hillis answered "no" when asked whether Judge Aycock ever explicitly stated "that he was not able to act as a neutral detached judge in the case in which [Mr. Hillis] represented [Mr. Villanueva's] son?"  *Id.* at 10.  He also acknowledged that Judge Aycock did not serve an active role in the investigation in the present case, that he was not an agent for the Oklahoma Bureau of Narcotics, that he did not actually search the house at issue, that to his knowledge Judge Aycock was not biased in any way, and that he did not rubber stamp the warrant.  *Id.*  Mr. Hillis agreed when questioned that Judge Aycock did not act improperly in any way when he determined probable cause existed to issue the search warrant.

Mr. Villanueva made an offer of proof that if he were allowed to testify,

> [h]e would state consistent with what's alleged in the motion
> respecting whether or not Judge Aycock was a neutral and detached

---

[8] Judge Aycock worked as an assistant district attorney for the Comanche County district attorney's office and had represented the state against Mr. Villanueva when he pled guilty to distribution of marijuana in 1996.

magistrate, that in a 2001 felony case in Comanche County in which he was the defendant and was represented by an attorney named Ken Sue Doerfl in Lawton, Judge Aycock refused to accept a plea agreement and told Mr. Villanueva that he was tired of seeing him in his Court. And when Mr. Villanueva said that sounds like a conflict of interest, at some point later in the proceedings the case was transferred from Judge Aycock to Judge McCall in Comanche County.

Rec., vol. 3 at 12. Mr. Villanueva argued at the suppression hearing that at least it appeared Judge Aycock "felt that he couldn't even be fair and impartial" for prosecuting Mr. Villanueva in a prior case, and that he could not be a neutral and detached magistrate. *Id.* at 14.

The district court was not persuaded Mr. Villaneuva had established Judge Aycock's lack of neutrality. The court explained:

I base that on a couple of things. One is, I think there is no suggestion from Mr. Hillis or anybody else that the judge somehow handled the affidavit improperly or acted in some procedurally improper way with respect to it. There is no suggestion that he considered matters outside the affidavit unless there's some inference to be drawn from these earlier circumstances that counsel has referred to. And it seems to me that those circumstances that have been identified are not sufficient to suggest to me that there was a reason to question the judge's neutrality.

*Id*. at 15.

The court then determined that the affidavit for the warrant established probable cause to search the residence at issue:

[T]here is substantial evidence that was submitted to the judge to indicate that the defendant was involved in an ongoing course of criminal conduct involving illegal drug dealing. The circumstances were laid out in some detail showing the defendant's presence at the

-11-

particular residence on multiple occasions over an extended period. I recognize that the particular residence that was searched here didn't belong to the defendant, but I think the evidence that was submitted as to the family relationships and the defendant's presence there on multiple occasions, the multiple instances, in fact, it appeared to be more or less continuous over a period of several days that the defendant's wife or girlfriend or other family members were there, suggesting the use of that residence by him on a regular basis notwithstanding the fact that he didn't own it.

All of that, against the backdrop of the circumstances that are indicated in the affidavit it seems to me are sufficient to make out a substantial basis for the judgment that probable cause to search the residence was present here.

I recognize that some of the evidence that was submitted, that there is a potential staleness issue here where some of the instances and evidence that was presented were at least two or three months old. But I think the cases recognize that when you're dealing with what's essentially an ongoing extended pattern of illegal activity, or where there is evidence of that, that the staleness consideration becomes somewhat less compelling than it would otherwise be. And in any event, as I say, it, in my view, does not undercut the conclusion that there was a substantial basis for the state judge's determination.

Rec., vol. 3 at 18-19.

The district court also addressed the good faith exception to application of the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984), noting that none of the situations where the good faith exception was inapplicable were present. The court explained that nothing suggested "there was false information presented to the judge" or any "improper conduct on the judge's part that would have been known to a police officer," and that there was nothing in the circumstances relating to the warrant that "would have caused a reasonable police officer to have any reason to doubt the validity of it." *Id.* at 20. The court

-12-

therefore concluded the good faith exception was an alternate basis for denying the motion.

After the district court denied the motion to suppress, the government filed a notice regarding the applicability of ACCA's sentencing enhancement under 18 U.S.C. § 924(e)(1).  Mr. Villanueva then waived his right to trial and entered a conditional plea of guilty, reserving his right to appeal the district court's order denying his motion to suppress and any imposition of a sentencing enhancement under ACCA.

At sentencing, Mr. Villanueva objected specifically to one of the three prior convictions alleged in support of the ACCA enhancement, distribution of marijuana, although he admitted that his objection to whether such distribution was a serious drug offense under ACCA was made only "in the event [that] the law were to change somehow in the future."  Rec., vol. 3 at 63.  He also argued that the ACCA enhancement violated the Sixth Amendment because the prior predicate convictions used to enhance his sentence were not submitted to a jury and proven beyond a reasonable doubt, but he admitted this was "a constitutional objection based on a potential change in the law in the future."  *Id.* at 64.

The district court overruled all of Mr. Villanueva's objections, adopted the findings in the PSR, and determined the guideline range to be 180 to 210 months in light of Mr. Villanueva's designation as an armed career criminal.  The court sentenced Mr. Villanueva to 210 months imprisonment.  This appeal followed.

## DISCUSSION

"'In reviewing the district court's denial of a motion to suppress, we review the court's factual findings for clear error and view the evidence in the light most favorable to the government.'" *United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011) (quoting *United States v. Worthon*, 520 F.3d 1173, 1178 (10th Cir. 2008)). "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010) (quoting *United States v McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000)). However, "[d]eterminations relating to the sufficiency of a search warrant and the applicability of the good-faith exception are conclusions of law" that we review de novo. *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000)).

Mr. Villanueva challenges the validity of the warrant on multiple theories. He argues (1) that the warrant was not issued by a neutral and detached magistrate; (2) that the documents relied on for the search warrant failed to establish probable cause because there was no showing of a nexus between the items sought and the residence searched and the information relied on to establish probable cause was stale; and (3) that the warrant authorized a general search. Mr. Villanueva alternatively contends the *Leon* good faith exception to the exclusionary rule does not apply because (1) "it was not issued by a neutral and

-14-

detached magistrate"; (2) "the warrant was so obviously based on speculation, surmise, cramped interpretations and inferences" it was devoid of factual support; and (3) the warrant was fatally deficient in failing to particularize the things to be seized and in its execution. Aplt. Br. at 34-35.

A. *Neutral and Detached Magistrate*

Mr. Villanueva first contends the search warrant was not issued by a neutral and detached magistrate, as shown by the fact that the issuing state court judge had previously prosecuted Mr. Villanueva, had refused to accept Mr. Villanueva's negotiated plea in a prior case, and had recused himself in a paternity case involving Mr. Villanueva's son. Because *Leon* allows us to turn directly to the good faith issue without first considering the validity of the warrant, 468 U.S. at 924, we decline to address defendant's argument on the merits and turn instead to a consideration of the officers' good faith.

The *Leon* good faith exception is normally applied in situations where a warrant lacked probable cause or failed the Fourth Amendment's particularity requirement. *See*, *e.g.*, *Leon*, 468 U.S. at 922 (creating good faith exception to exclusionary rule for evidence obtained by officers acting in reasonable reliance on search warrant later found to lack probable cause); *Roach*, 582 F.3d at 1203-05 (applying *Leon* good faith exception to save warrant that lacked probable cause); *Massachusetts v. Sheppard*, 468 U.S. 981, 987-88 (1984) (extending *Leon* good faith exception to save evidence obtained under warrant that did not particularly

-15-

describe items to be seized); *United States v. Potts*, 586 F.3d 823, 831-35 (10th Cir. 2009) (electing to bypass question whether warrant met particularity requirement because evidence admissible under *Leon*). This case calls for us to apply *Leon* where the judge who issued the search warrant was arguably not neutral and detached.[9] Although we are unaware of any court applying the good faith exception in such circumstances, it is apparent from *Leon* itself that the good faith exception is applicable in this situation.

First, *Leon* makes clear that "[p]enalizing the officer for the magistrate's error . . . cannot logically contribute to the deterrence of Fourth Amendment violations." 468 U.S. at 921. Just as an "officer cannot be expected to question the magistrate's probable-cause determination," *id.*, neither can he be expected to question the magistrate's neutrality when there is no outward appearance of any impropriety. Mr. Villanueva does not set forth any evidence or argument that Agent Thompson could have, or should have, reasonably known about any alleged bias the issuing judge might have had against Mr. Villanueva. And certainly nothing in the warrant itself could have placed a reasonable officer executing the warrant on notice that the issuing judge was not neutral and detached.

Second, *Leon* states that the good faith exception in the context of whether the issuing magistrate was neutral and detached is inapplicable only when the

_____

[9] We express no opinion as to whether Judge Aycock was neutral and detached when he issued the warrant.

"issuing magistrate wholly abandon[s] his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)." 468 U.S. at 923. In *Lo-Ji Sales*, the Court held a search warrant invalid because the town justice issued an open-ended warrant to search an adult bookstore, which was believed to be violating state obscenity laws, and accompanied the police officers to the store to make probable cause determinations on the scene. 442 U.S. at 321-22. The Court held that the town justice had "allowed himself to become a member, if not the leader of a search party which was essentially a police operation." *Id.* at 327. *Lo-Ji Sales* thus stands for the proposition that a magistrate "wholly abandons his role" when he aides law enforcement officers in their investigation of a crime. Mr. Villanueva does not even argue that the state court judge who issued the warrant in this case abandoned his judicial role. Accordingly, even assuming the issuing magistrate was not neutral and detached and that he should have recused himself from issuing the warrant, we reject Mr. Villanueva's argument that the *Leon* good faith exception does not apply to support the district court's denial of the motion to suppress.

## B. *Probable Cause Issues*

Mr. Villanueva next claims that the warrant was not supported by probable cause because it raised only a mere suspicion of his involvement in a drug conspiracy, there was no showing of a nexus between the items sought and the residence searched, and the information relied on for the warrant was stale.

A judge's probable cause determination is generally afforded great deference. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). But this deference presupposes that "the magistrate judge's 'neutral and detached function' has been properly fulfilled." *United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009) (quoting *Gates*, 462 U.S. at 236, 240). Because we have not decided whether the issuing judge here was neutral and detached, we turn directly to a consideration of the officers' good faith reliance on the warrant.

*Leon* explained that an officer cannot be said to manifest objective good faith if he relies "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)). "When an officer searches pursuant to a warrant, *Leon* generally requires we presume the officer acted in good-faith reliance upon the warrant." *Campbell*, 603 F.3d at 1225. The officer's "reliance is only 'entirely unreasonable' when the affidavit is 'devoid of factual support.'" *Id.* at 1230 (quoting *United States v. Henderson*, 595 F.3d 1198, 1201-02 (10th Cir. 2010)). Mr. Villanueva argues that this is the case here.

"An affidavit is not devoid of factual support if it establishe[s] a minimally sufficient nexus between the illegal activity and the place to be searched." *Id.* at 1231 (quotation marks omitted). An affidavit meets this "minimal nexus" requirement when it "'describes circumstances which would warrant a person of

-18-

reasonable caution' in the belief that the 'articles sought' are in a particular place." *Biglow*, 562 F.3d at 1279 (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 874 (10th Cir. 1992)). Our decision in *Roach*, 582 F.3d at 1202-03, is particularly instructive. There, we held the affidavit failed to set forth sufficient facts to establish probable cause to believe the defendant resided at the location to be searched. Nevertheless, we applied the *Leon* good faith rule to uphold the search because the affidavit set forth enough language indicating the officers used at least one investigative technique to "provide a 'minimal nexus' connecting Roach to the address." *Id.* at 1204. We held it was not "entirely unreasonable, therefore, for officers executing the warrant to rely on the magistrates authorization of it" since it was "not a 'bare bones' affidavit of the sort disapproved in *Leon*." *Id.*

Contrary to Mr. Villaneuva's contention, the affidavit here is "not so facially deficient or so lacking in indicia of probable cause that the officer's reliance on the warrant in conducting the search was objectively unreasonable." *United States v. Rowland*, 145 F.3d 1194, 1207 (10th Cir. 1998). The affidavit set forth wiretap communications demonstrating Mr. Villanueva's involvement in on-going distribution of narcotics and his use of others to carry out his orders. The affidavit linked his utilization of the family residence using ping data from Mr. Villanueva's and other co-conspirators' phones, which placed them at the residence while discussing criminal activity. During surveillance, officers

observed vehicles connected to Mr. Villanueva's family and girlfriend at the residence. These facts provided a minimal nexus connecting Mr. Villanueva to the residence and to possible contraband to be found there.

Although the affidavit here sought to search a residence that was suspected of being used by Mr. Villanueva for drug distribution but not owned by him, Agent Thompson relied on information connecting Mr. Villanueva, his co-conspirators, his wife, and his girlfriend to the house, which was owned by Mr. Villaneuva's stepfather. "It is undisputed that 'a law enforcement agent's opinion, based upon his professional expertise, that evidence of illegal activity will be found in the place to be searched, is entitled to consideration in our determination of whether probable cause existed at the time a warrant issued.'" *United States v. Harrison*, 566 F.3d 1254, 1256 (10th Cir. 2009) (quoting *United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004)). Agent Thompson presented numerous facts and his own opinion, based on his extensive training, which more than met the "minimal nexus" requirement. *Campbell*, 603 F.3d at 1231.

Mr. Villanueva also argues that the information used to support the issuance of the search warrant was stale because the search and arrest warrant affidavits used events from October 2012 to tie drug activity to the Lawton residence, but the house was not searched until January 2013. "[P]robable cause to search cannot be based on stale information that no longer suggests that the

items sought will be found in the place to be searched." *Roach*, 582 F.3d at 1201 (alteration in original) (quoting *Mathis*, 357 F.3d at 1206-07). As we recognized in *Mathis*, however, "whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." 357 F.3d at 1207 (quoting *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990)). We noted that Mathis' continuous and ongoing drug activity undermined the claim of staleness.

As in *Campbell*, "[w]e need not decide whether the affidavit's information on [Mr. Villanueva] was so stale as to not support probable cause because we conclude the affidavit provided sufficiently recent information to support the executing officers' reliance on the magistrate's authorization." 603 F.3d at 1233. The most recent information tying the Lawton residence and Mr. Villanueva to drug activity preceded the search by only three months. In *Mathis*, 357 F.3d at 1203, 1206, we held two-month-old information was not stale, and in *United States v. Myers*, 106 F.3d 936, 939 (10th Cir. 1997), we held that five-month-old information was not stale. Both of these cases involved illegal drug distribution, as here. It was reasonable for the officers in this case to rely on the magistrate's authorization when similar gaps of time have been upheld by our court in the past.

In sum, we hold that the affidavit provided sufficient indicia of probable cause to justify the executing officers' good faith reliance upon the magistrate's issuance of the search warrant.

*C. General Search*

Mr. Villanueva contends the warrant was overbroad in both its issuance and its execution and consequently resulted in a general search in violation of the Fourth Amendment, which requires that warrants "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV. We disagree.

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas*, 379 U.S. 476, 485, (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (problem of general warrant "is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings"). "The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985). A warrant describing "items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity under investigation permit." *United States v. Wicks*, 995 F.2d 964, 973 (10th Cir. 1993) (quoting *United States v. Harris*, 903 F.2d 770, 775 (10th Cir. 1990)). We review de novo the legal question of whether a warrant is overbroad. *Id.*

With this framework in mind, we turn to the search warrant in this case. Attachment B of the warrant set forth an extensive list of items to be seized, all limited by the general specification that they evidence "the business of illegal drug distribution and laundering profits from [the] enterprise" in violation of the Oklahoma drug statutes. Rec., vol. 1, at 285. The list included bank records, cash receipts, telephone records, investment records, and credit card records relating to All-Star Automotive, the business through which Mr. Villanueva was suspected of laundering drug money. In addition to these items, the warrant allowed for the seizure of all computer storage devices used to store the above information, all electronic communications between identified co-conspirators, and all the paraphernalia used for packaging, cutting, weighing, and distributing illegal narcotics. Although Mr. Villanueva argues that this list permitted the search and seizure of any and all property in the residence, we have repeatedly "upheld search warrants cast in comparably broad terms, where the subject of the search was a drug trafficking or drug dealing business, and where the circumstances permitted only a more general listing of the items to be seized." *Wicks*, 995 F.2d at 973 (upholding search warrant allowing seizure of "large amounts of United States currency . . . books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale and distribution of controlled substances . . . contraband, proceeds of drug sales and/or records of drug transactions, drug sources, and drug customers . . . safe deposit boxes . . .

caches of drugs, large amounts of currency, financial instruments, precious

metals, jewelry . . . addresses or telephone numbers in books or papers . . .

photographs . . . paraphernalia . . . includ[ing] syringes, bottles, scales, plastic

bags, balloons, heat sealers, glassware, chemicals, mechanical stirrers, and/or heat

sources[,] . . . stolen weapons or goods." *Id.* at 967) (citing *United States v.*

*Sullivan*, 919 F.2d 1403, 1424 n. 31 (10th Cir. 1990); *United States v. Harris*, 903

F.2d 770, 774-74 (10th Cir. 1990); *United States v. Riley*, 906 F.2d 841, 845 (2d

Cir.1990)).  Given our precedents upholding the validity of similar warrants in

similar situations, we hold that the warrant in this case met the Fourth

Amendment's particularity requirement.

Mr. Villanueva also makes a conclusory argument that the search inventory

indicates the officers exceeded the scope of the warrant when they searched the

Lawton residence, and he correctly points out the "good faith exception does not

apply to the improper execution of a warrant." *United States v. Moland*, 996 F.2d

259, 261 (10th Cir. 1993).  But Mr. Villaneuva provides no evidence or argument

showing there was a general rummaging for evidence during the search.  The

search inventory indicates that all items taken were permitted to be taken by the

search warrant, which described the evidence with particularity.  The search thus

did not exceed its scope.

*D. The Armed Career Criminal Act*

Lastly, Mr. Villanueva contends the district court erred in classifying him

as an armed career criminal and enhancing his sentence under ACCA. We review a de novo a sentence enhancement imposed under ACCA. *United States v. Delossantos*, 680 F.3d 1217, 1219 (10th Cir. 2012). "The government carries the burden of proving by a preponderance of the evidence that an enhancement is appropriate." *Id.* (quoting *United States v. Johnson*, 130 F.3d 1420, 1430 (10th Cir. 1997)).

The Armed Career Criminal Act establishes a minimum fifteen year sentence for anyone convicted under 18 U.S.C. § 922(g) who also has three separate convictions for a "violent felony" or a "serious drug offense." 18 U.S.C. § 924(e). Mr. Villanueva argues his classification as an armed career criminal under ACCA violates his Sixth Amendment rights because the prior predicate crimes used to enhance his sentence were not proven to a jury beyond a reasonable doubt. This argument is foreclosed by Supreme Court and Tenth Circuit precedent, as Mr. Villanueva admitted below and again concedes on appeal. *See Almendarez-Torrez v. United States*, 523 U.S. 224, 226-27 (1998) (sentencing judge may find prior conviction used to increase sentence by preponderance of the evidence); *United States v. Moore*, 401 F.3d 1220, 1224 (10th Cir. 2005) (rejecting Sixth Amendment argument and noting that "[a]lthough the Court may overrule *Almendarez-Torres* at some point in the future, it has not done so, [and] we will not presume to do so for the Court" because "we are bound by existing precedent"); *see also United States v. Dorris*,

236 F.3d 582, 587-88 (10th Cir. 2000) (rejecting Sixth Amendment argument that prior convictions used to apply ACCA enhancement must be charged in indictment and proven to jury beyond a reasonable doubt).

Mr. Villanueva also argues that one of his prior convictions in Oklahoma for distribution of marijuana is not a serious drug offense for purposes of ACCA and that the district court therefore erred in using it to increase his sentence. ACCA defines a "serious drug offense" as:

> (i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import Act and Export Act (21 U.S.C. 951 et seq.) or chapter 705 of title 46, for which a maximum term of imprisonment of ten years or more is prescribed by law; or

> (ii) *an offense under State law*, involving manufacturing, distributing or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), *for which a maximum term of imprisonment of ten year years or more is prescribed by law*.

18 U.S.C. § 924 (e)(2)(A) (emphasis added).

Notwithstanding the explicit language of the Act, Mr. Villanueva contends that "the focus for ACCA purposes should be the sentence actually received, rather than the statutory maximum." Aplt. Br. at 42. He posits that his prior Oklahoma conviction for distribution of marijuana is not a serious drug offense under ACCA because he only received a sentence of six years, which "does not meet the 10 year threshold of § 924(e) for a 'serious drug offense.'" *Id.* Moreover, he asserts that because marijuana is legal in Colorado and Washington

for recreational and personal use, and legal for medicinal purpose in twenty states and the District of Columbia, "distribution of marijuana cannot be considered a 'serious drug offense' for purposes of the ACCA." Aplt. Br. at 42. But Congress has determined otherwise. Distribution of marijuana remains illegal in Oklahoma and carries a maximum sentence of life imprisonment. Okla. Stat. tit. 63 § 2-401. The plain language of ACCA clearly states that a state offense is a serious drug offense if the "maximum term of imprisonment of ten years or more is prescribed by law." § 924 (e)(2)(A)(ii). *See McNeill v. United States*, 131 S. Ct. 2218, 2224 (2011).

The district court did not err in applying the ACCA enhancement and overruling Mr. Villanueva's objection to his sentence.

## CONCLUSION

We **AFFIRM** Mr. Villanueva's conviction and sentence.